IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


The United States of America,

                         Plaintiff,

            versus          3:10CR398

Israel Cruz Millan,

                         Defendant


before:  HONORABLE JAMES R. SPENCER
         United States District Judge


Sentencing

February 16, 2012
Richmond, Virginia


Gilbert F. Halasz, RMR
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, Virginia 23219

(804) 916-2248

APPEARANCES


Michael R. Gill, Esq.

Angela Miller, Esq.

Addison B. Thompson, Jr., Esq.

for the United States


Atchuthan Sriskandarajah, Esq.

Rober Varner Combs, III, Esq.

for the defendant

The defendant

in his own proper person

```
 1          THE CLERK:  Case number 3:10 CR 308.

 2          The United States of America versus Israel Cruz

 3   Millan.

 4          The United States is represented by Michael

 5   Gill, Addison Thompson, and Angela Miller.

 6          The defendant is represented by Atchuthan Sris.

 7          Are counsel ready?

 8          MR. GILL:  United States is ready, Your Honor.

 9          MR. SRISKANDARAJAH:  Defendant is ready, Your

10   Honor.

11          THE COURT:  All right.

12          Government?

13          MR. GILL:  Good morning, Your Honor.

14          The defendant is before The Court this morning

15   after having previously pled guilty to counts one,

16   nine and ten of the indictment; count one charging

17   conspiracy; count nine charging him with conspiracy

18   to possess, produce, and transfer false

19   identification documents; count ten being money

20   laundering conspiracy.

21          As he stands before The Court this morning he

22   is offense level of 38.  Guidelines criminal history

23   category one.  Yields a range of 235 to 293 months.

24   There are no objections to the calculations from

25   either side.
```

1          The United States has moved for an upward

2     variance, and the defense has moved for a downward

3     variance.

4          THE COURT:  All right.

5          Mr. Cruz Millan, would you stand where you are,

6     please.

7          Sir, have you had an opportunity to have this

8     presentence report explained to you and then

9     discussed it with your lawyer?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  All right.

12          Thank you.  You may have a seat, sir.

13          Counsel, if you would would approach.

14          Counsel, have you had adequate opportunity to

15     review the presentence report and discuss it with

16     your client?

17          MR. SRISKANDARAJAH:  I have, Your Honor.

18          THE COURT:  Do you have any objections,

19     corrections, or amendments to the presentence report

20     as offered?

21          MR. SRISKANDARAJAH:  No, Your Honor.

22          THE COURT:  All right.

23          You may have a seat.  I will hear the motion

24     from the government.

25          MR. GILL:  Your Honor, this morning in support

Joseph – direct

1    of our motion for upward variance we have two

2    witnesses.  Special Agent Joseph will be the first

3    to call.

4          THE COURT:  All right.

5                          P. JOSEPH

6            WAS SWORN AND TESTIFIED AS FOLLOWS:

7                       DIRECT EXAMINATION

8    BY MR. GILL:

9    Q    Good morning.

10         Please introduce yourself to Judge Spencer.

11   A    Good morning.

12         P. Joseph, Special Agent Homeland Security

13   Investigation.

14   Q    How long have you been an agent with Homeland

15   Security Investigation?

16   A    Since November of 2003.

17   Q    Are you one of the lead investigators assigned

18   to the case involving Israel Cruz Millan and the

19   criminal enterprise at the heart of this case?

20   A    Yes, sir, I am.

21   Q    I want to talk to you specifically about Israel

22   Cruz Millan today.  Starting out, can you give Judge

23   Spencer just a brief description, overall nature of

24   the investigation, and the extent of the criminal

25   enterprise that you uncovered here in the United

Joseph – direct                               6

1    States?

2    A    Briefly, this organization is that, that we

3    started looking at, quickly developed.  We realized

4    it was a massive organizational structure that has

5    ties to Mexico; 18 cells, 13 states, most of the

6    east cost, some of the midwest.  The organization

7    sold tremendous amount of counterfeit identification

8    documents and wired over a million dollars in three

9    years to Mexico.

10   Q    At the heart of your knowledge about this

11   organization, aside from search warrants and

12   subpoenaed records, were there six different wire

13   taps, court-authorized wire taps?

14   A    Yes, sir.

15   Q    As as well as numerous debriefings of numerous

16   co-conspirator in this investigation?

17   A    Yes, sir.

18   Q    Through all that work, tell us, who was in

19   charge of the organization at the time of the

20   nation-wide take-down in November of 2010.

21   A    Israel Cruz Millan or El Muerto.

22   Q    El Muerto, generally what does that mean?

23   A    Translated to the "dead one."

24   Q    Describe for us the nature of the supervision

25   that he exercised for this organization when he was

Joseph – direct

1    in charge?

2    A    We learned very, very quickly that he was

3    essentially a micro manager.  He oversaw daily

4    operations, numerous cells on a daily basis; all the

5    way from accounting to sales, supply, competition,

6    internal problems.  He was, he had his hand in all

7    of it.

8    Q    Where -- and describe for us the general

9    hierarchy of this organization.  Where he falls in

10   that hierarchy.

11   A    Again, very clear from the very beginning he

12   was essentially the top guy in the United States.

13   He was the CEO.  Through the intercepts we found

14   that there were leadership in Mexico, but there was

15   nothing close to the leadership on his level here in

16   the United States.  He was absolutely the top dog.

17   Q    In that position, as far as the operation of

18   the cells within the United States, did your

19   investigation show that indeed he was the one who

20   was in charge of coordinating all that?  There was

21   not contact from Mexico to these cells?  Instead it

22   his him?

23   A    It was Cruz Millan who made the vast majority

24   of the decisions.

25   Q    Overall, describe for us the amount of time you

Joseph – direct                                    8

1    had him connected to this organization we are going

2    to talk, about his time as supervisor.

3    A    We have him -- we have an arrest for

4    counterfeit identification documents related to

5    crime in Nashville in 2006, Nashville, Tennessee,

6    where he was arrested with laminators, printers,

7    computers.  Typically all of the tools needed to

8    create, manufacture identification documents.  As

9    far as, very consistent with, also with the

10   equipment we found on November 18 of 2010 throughout

11   the country during the nation-wide take-down

12   operation.

13   Q    In fact, as we will discuss, Nashville,

14   Tennessee was one of the operating cells for this

15   organization even at the time of the take-down?

16   A    Yes, it was.

17   Q    Now, describe for us what you uncovered through

18   the investigation with respect to his link to time

19   as the overall supervisor of U.S. operations.

20   A    Through the debriefs of multiple cooperating

21   defendants we learned that he has been in charge

22   essentially 18 months to two years in the United

23   States.

24   Q    Through the investigation, including wire tap

25   intercepts, are you aware of anyone else taking over

1    supervision during that time period?

2    A    No, sir.

3    Q    With respect to coordinating cell operations,

4    including the acts of violence, were you aware of

5    instances that actually resulted in acts of violence

6    or planned acts of violence where he was not

7    involved?

8    A    No.

9    Q    Let's talk about the defendant's connection to

10   violent events.  First off, tell us overall this

11   organization's connection with violence, both

12   internally and externally.

13   A    Before the violence you have to understand the

14   organization was built on total control.  Control

15   was the main function to keep order.  To keep people

16   from selling internally, control over market place.

17   Violence was a tool that was used to maintain that

18   control.  So violence was used internally to

19   maintain discipline, maintain the rules of the

20   organization.  As well as violence was obviously

21   used externally in the community to cement their

22   foot hold, eliminate competition and raise market

23   price.

24   Q    In fact, first talk a little bit about

25   internally.  Are you aware of specific acts or, you

1    know, general method they would use to address

2    serious violations of internal rules?

3    A    Absolutely.

4    Q    What type of instances would they use?

5    A    It was essentially, or exactly, standard

6    operating procedure by the organization when they

7    went and laid a hit on a competitor, or what they

8    would call a cleaning, they would use, we saw

9    numerous --

10        MR. SRISKANDARAJAH:  Objection, Judge.  I

11    believe the question was internally.

12    BY MR. GILL:

13    Q    Internally, first, and then we will talk

14    externally.

15    A    Yes.  There was an act of violence internally

16    in Raleigh, North Carolina, September 29.

17    Q    Are you aware of other acts including events

18    that occurred here in Richmond, Virginia?

19    A    Yes, sir.

20    Q    Did that involve Jose or J. M. M., who

21    testified at trial?

22    A    Yes.  That's correct.

23        MR. GILL:  Your Honor, we move for admission of

24    exhibit number 17, which is the testimony of J. M.

25    M. from the trial.

1       THE COURT:  All right.

2       MR. GILL:  Just to move things along if it is

3   okay with The Court, I would like to refer to three

4   different pages.

5       THE COURT:  Go ahead.

6       MR. GILL:  36 through 38, Your Honor.

7       J. M. M. testified at trial that in Richmond,

8   we were in Norfolk, but we went to a meeting in

9   Richmond.  They started talking there about the

10  people who had broken the rules.  So then once they

11  started talking about who hod broken the rules, they

12  got them together and they were spanked.

13      Question:  Okay.  Who was in charge of that

14  meeting?

15      Answer:  Muerto.

16      Question:  What Did he say was the reason he

17  was having the meeting?

18      Answer:  Because many people were lowering the

19  price of the documents and taking customers away

20  from other members.

21      Turning to page 37 at line 6.

22      Question:  How many people approximately were

23  there at this meeting?

24      Answer:  Like 15 or 20.

25      Question:  Who was being punished at this

1    meeting by spanking?

2        Answer:  There were various ones.  This was

3    Chacho, Cheyung.  Another two people and me.  So I

4    wouldn't be spanked I got in with it, too.

5        Question:  Tell the jury why -- tell the jury

6    what happened when Chacho and Cheyung got spanked.

7        Answer:  They were put in place, and each

8    person would give them a spanking.  But they would

9    have to take their pants down.

10       Question.  Who had to participate in the

11   spanking?

12       Answer:  Everybody.  One of the rules was that

13   you had to hit hard because if you didn't, you would

14   get it, too.

15       And then the top of page 38 in response to the

16   question:  Did you hit Chacho and Cheyung?

17       Answer:  I didn't hit Cheyung hard.  And he

18   told them that I had not hit him hard.

19       Question:  What happened because you had,

20   didn't hit Cheyung hard enough?

21       Answer:  They put my in as well.

22       Question:  Were you spanked?

23       Answer:  Spanked and without eye brows.

24       Now, that type of event, Agent Joseph, that you

25   heard about in debriefs of co-conspirators involved

1    in this case?

2    A    We heard that exact same thing over and over.

3    Q    Now, then you mentioned externally.

4         Now, before we talk about externally, tell

5    Judge Spencer, did it appear based on your

6    investigation and knowledge of this organization

7    that the acts of violence, particularly once

8    externally, started more recently, or was this

9    something that was a culture of this organization?

10   A    It was absolutely part of the culture.

11   Q    How far back?  Do you have examples of them

12   dating back to even before 2010?

13   A    We have a record of an additional homicide than

14   previously mentioned to this court in Little Rock,

15   Arkansas in 2008.  Back then.

16   Q    Was there then an event that occurred in the

17   Richmond area as well?

18   A    There is.  In June of 2009.

19   Q    Will you identify a pattern they generally

20   followed in executing attacks against competition?

21   A    Absolutely.

22   Q    What was the pattern that they chose to follow?

23   A    The similarity between these acts that we have

24   been able to identify over the two-year

25   investigation, these guys, standard operating

1        procedure, they have pre-paid phones, they find an

2        abandoned houses, trailers.  They used duct tape.

3        They use multiple members to gang up on rival

4        document manufacturers or sales person to lure them

5        to this abandon house.  They will take them in.

6        They will assault them.  They will interrogate them.

7        They will threaten them with multiple instances of

8        use of a gun, and they will interrogate specifically

9        unaware of the location of their equipment, document

10       manufacturing equipment.

11       Q    Through the investigation, co-conspirator

12       debriefings, as well as wire tap intercepts, what

13       can you tell us with respect to supervisory roles of

14       the defendant as far as being involved in acts of

15       violence?

16       A    Again, Cruz Millan was a micro manager.  Every

17       act of violence we saw went through him.  There was

18       talking, there was talk on a cell level about acts

19       of violence.  They would have to wait for

20       authorization from Cruz Millan.

21       Q    Now, I want to talk about specifics first.

22       Raleigh, North Carolina.

23            Just generally, describe for us the

24       significance of that cell for the organization, and

25       who was in that area for the events on October 29 of

1     2010?

2     A     We knew Raleigh to be one of our major cells.

3     And we also knew that Cruz Millan was either living

4     there or spending the vast majority of his time

5     there.

6     Q     Generally, what major event occurred there on

7     October 29 of 2010?  How did you become aware of it?

8     A     We were sitting in the monitor room on a Friday

9     evening when I a call came in from our Spanish

10    speaking monitor informed us that a gentleman, a

11    man, was about to, was getting beat up by Cruz

12    Millan.

13    Q     We will talk in couple minutes about the steps

14    that you and other investigators took.  But give

15    Judge Spencer a description, just the overall

16    evidence that you gathered in the investigation

17    about that event that gave you an inside look at

18    what happened.

19    A     Well, throughout the call she was letting us

20    know there was lot of yelling, that it was

21    definitely business-related, it was

22    fraudulent-document related.  It was also internal

23    member that was being disciplined, the words

24    "torture" was used.  To preserve life we notified

25    Raleigh Police Department of the incident who

1    actually responded, and ultimately conducted a

2    search warrant at the residence.  They were also

3    able to locate the victim of that assault.

4    Q    Was that victim interviewed?

5    A    He was.

6    Q    In addition, did D. F. A., who testified at the

7    trial of Edy Oliverez-Jiminez, testify about him

8    being present and what happened in relation to that

9    event?

10   A    He was present.

11        MR. SRISKANDARAJAH:  Objection, Judge.  That

12   would be hearsay.

13        THE COURT:  Overruled.

14        THE WITNESS:  He testified that he went to the

15   residence.  Saw Cruz Millan grab an individual named

16   Chingway off the couch.  He was on the couch

17   sleeping.  Grabbed him, began to assault him.  Threw

18   him, dragged him upstarts of the residence.  Short

19   time later the -- sorry.

20   BY MR. GILL:

21   Q    D. S. A.?

22   A    D. S. A. was summoned up to the room.  Sorry.

23   Let me go back a second.

24        Previously that day Cruz Millan ordered him to

25   go and buy a bucket, jumper cables, as well as duct

1    tape.

2         Back to the room.  D. S. A. entered the room,

3    saw Chingway bound to the chair with duct tape.

4    Cruz Millan asked him for his telephone, which he

5    had other, several phones laid out on the bed.  He

6    basically -- Cruz Millan made a conference call to

7    other cell members and proceeded to orchestrate and

8    participate in the assault, and ultimately the

9    electrocution of Chingway.

10   Q    What did they use to electrocute Chingway?  And

11   tell Judge Spencer about D. S. A. testimony how they

12   were able to make a connection on that?

13   A    D. S. A., as I say, went up there.  He saw they

14   were using the car battery, the jumper cables, and

15   then there was a bucket.  They were initially

16   shocking Chingway without the use of bucket of

17   water, but according to D. S. A. Cruz was

18   unsatisfied with the results of the, I guess the

19   conductive nature without the water.  So he

20   instructed D. S. A. to get the bucket of water, get

21   a bucket, fill it up, and place Chingway's feet in

22   the bucket, and proceeded to electrocute him, which

23   was more satisfactory to Cruz Millan.

24   Q    Now, explain to us, D. S. A., what was his role

25   for the organization and connection to Raleigh; and

1    Chingway, what position was he in the organization?

2    Where was he brought in from for this attack?

3    A    He was the cell manager for the Raleigh cell.

4    Actually, was also potentially roommates with Cruz

5    Millan at that period of time.  Chingway was a

6    runner in the Greensboro, North Carolina cell.

7         MR. GILL:  Your Honor, we move for admission of

8    exhibit number 5, which is the testimony of D. S. A.

9    from the jury trial of Edy Oliverez-Jiminez from

10   this event.

11        THE COURT:  It will be admitted.

12   BY MR. GILL:

13   Q    Now, then, Agent Joseph, I know you have a

14   stack of exhibits there in front of you.  If you

15   would take a look at exhibit number 2.  Are these

16   generally photographs that were taken at the

17   Whitehall address where this attack occurred on the

18   night of October 29 of 2010 by Raleigh Police

19   Department?

20   A    That's correct.

21        MR. GILL:  Your Honor, we move admission of

22   exhibit number 2.

23        THE COURT:  It will be admitted.

24   BY MR. GILL:

25   Q    Explain to us -- on the screen there we have

Joseph – direct                                                     19

```
 1    page one -- what are we looking at?

 2    A    This is just the residence at Whitehall Avenue

 3    in Raleigh.

 4    Q    In fact, that is where the residence is?

 5    A    It is the far end.

 6    Q    Now then, turning to -- look at page 4, please.

 7         Explain to us what we are looking at there.

 8    A    This is, according to D. S. A., the couch where

 9    Chingway was sleeping that Cruz Millan pulled him

10    off and began to assault him.

11    Q    The next page, page 5, please.

12    A    Cruz Millan forced Chingway up the stairs.

13    Q    Page 5.  Okay.

14         There you go.

15    A    Sorry.  The stairs.

16    Q    Yes.  These were the stairs?

17    A    These were the stairs that Chingway was dragged

18    up or forced up to the room where he was eventually

19    tied to or taped to a chair with duct tape.

20    Q    And then page 6.

21    A    Actually the chair.  And in the back you see

22    the bed which is, according to D. S. A., where the

23    phones were laid out for this pseudo conference

24    call.  Because you see the chair is broken and

25    pieces are laying on the ground.
```

1    Q    Now, you indicated that you notified Raleigh

2    Police Department about this after you became aware

3    of the event.  Are you aware of what happened with

4    Chingway, if he was able to get away?

5    A    Chingway provided a statement, a brief

6    statement to the Raleigh Police Department and said

7    that he was able to jump out, escape out the second

8    story window.  Jumped out -- and.

9         MR. SRISKANDARAJAH:  Judge, I object.  This is

10   definitely hearsay, Judge.

11        THE COURT:  I know it is hearsay.

12        MR. SRISKANDARAJAH:  I understand, Judge.

13        THE COURT:  Go ahead.

14   BY MR. GILL:

15   Q    Thank you.

16        There do you see the window where he would have

17   escaped from in that photograph?

18   A    Yes, absolutely.  Especially on page 3,

19   actually.

20   Q    Look at page 2.  First slide.

21   A    Page 2.  Much better shot.

22   Q    Okay.

23   A    That would be the window of that bedroom.  And

24   closer examination of that --

25   Q    Page 3?

```
 1    A     -- siding on page 3, Raleigh Police Department,
 2    close-up here, right here, is going to this spot
 3    over here is going to be blood.  Blood spots.
 4    Q    If you will touch the lower right hand of the
 5    screen.
 6         Was the victim treated for injuries, and
 7    generally what injuries did he receive as a result
 8    of this his attack?
 9    A    He was treated as Wake Medical Hospital.  And
10    the numerous injuries across his body, severe
11    lacerations, he had a mangled ear.  Probably the
12    most severe were two injuries, were a series of
13    cracked vertebrae, as well as burn marks across the
14    torso of his body.
15    Q    You indicated that there were two calls,
16    conference calls, that were intercepted?
17    A    Yes, sir.
18    Q    Generally, did both of them follow the same
19    pattern and show the same level of violence?
20    A    When the first one ended we thought that it was
21    over.  And then the monitor immediately said that he
22    was making another call, and it was the exact same
23    in nature.  And after looking at the translation, we
24    were able to see it was the exact series of demands,
25    assaults, of warnings to other members that things
```

1      were going to change, things needed to be tightened

2      up, or any one of them could be in store for a

3      beating or torture that he was delivering that night

4      to Chingway.

5           MR. GILL:  Your Honor, at this time we move

6      admission of Government's exhibits number 1, a

7      compact disc, that contains some of these recordings

8      that are marked as Government's exhibits.  And we

9      also move for admission of exhibit 3 and 4, which

10     are the transcripts from those recordings that Agent

11     Joseph is testifying about.

12          THE COURT:  They will be admitted.

13          MR. GILL:  At this time, Your Honor, government

14     will play the recording for Government's exhibits

15     number 4, which is call number 1 of 6, that occurred

16     roughly 6:14 p.m. October 29 of 2010.

17                    (Disc being played)

18     BY MR. GILL:

19     Q    Before we go further, please describe for the

20     Judge who the players are on the ground in the room

21     at the time this recording is being made?

22     A    According to this call, the previous call as

23     well, as well as testimony from D. S. A., we know

24     that Cruz Millan was in the room.  Chingway is bound

25     to the chair in the room.  Two individuals we have

```
 1    determined are enforcers or beaters of the
 2    organization, named Peron and Yugo.
 3         And according to D. S. A. the cell leader,
 4    Gabriel, I believe his name was.  Sorry.  That was
 5    El Gotto.
 6    Q    And according to D. S. A. testimony and the
 7    nature of the recording itself, overall, who was in
 8    charge of this from the start to the finish?
 9    A    It is very clear it is Cruz Millan is the --
10    owns the room.  He is controlling.  He is doing the
11    instructing and making phone calls.
12                        (Disc being played).
13         MR. GILL:  Your Honor, the recording is on the
14    monitor.  It follows step by step.
15         (Disc being played)
16    Q    Basically are they getting all the players?
17    Are these cell managers that you recognize from the
18    nicknames?
19    A    Absolutely.
20    Q    Panales is another?
21    A    Nariz is another cell leader.
22                        (Disc being played)
23    Q    Agent Joseph, I know this is the second call of
24    of the two, but in the first call, similar nature,
25    same type beating you can hear in the background?
```

Joseph – direct                                    24

1    A    Yes, sir.

2    Q    Pain?

3    A    Yes, sir.

4    Q    Let's talk about Little Rock, Arkansas.

5         Turning to Government's exhibits number 8,

6    which is a few photographs from the murder location.

7    Your Honor, we move admission of those.

8         THE COURT:  They will be admitted.

9    BY MR. GILL:

10   Q    Agent Joseph, in very, very quick general terms

11   tell us generally what happened at that trailer as

12   far as the organization and who were the

13   on-the-ground participants that we believe were

14   involved based on the investigation?

15   A    This is the abandoned trailer on July 6, 2010

16   where the body was discovered bound and beaten.

17   Involved in this homicide was Edy Oliverez-Jiminez,

18   Armando Gonzales Medina, and Erik Martinez-Ortiz.

19   Q    Was Edy Oliverez-Jiminez convicted at trial for

20   his role in that murder?

21   A    Yes, sir, he was.

22   Q    What was his position in the organization in

23   Little Rock at the time murder?

24   A    He was cell leader.

25   Q    The other two you mentioned?

1    A    Runners.

2    Q    Per your knowledge of how the organization

3    worked, and to be fair, is there any evidence that

4    Israel Cruz Millan was present in Little Rock,

5    Arkansas at the time?

6    A    No, sir.

7    Q    But based on your knowledge of the

8    organization, how it works, and acts of violence,

9    what would have been his role?

10   A    It would have been authorized.

11        MR. SRISKANDARAJAH:  I object.  That would be

12   still speculation at this point.

13        THE COURT:  Sustained.

14   BY MR. GILL:

15   Q    Agent Joseph, describe generally for Judge

16   Spencer the level of phone, telephone toll analysis

17   you did in this investigation, focusing specifically

18   on Little Rock.

19   A    This is as extensive as as I have ever

20   conducted in my career.  Specifically we analyzed

21   over 770,000 calls throughout the investigation.

22   And we pinpointed –– we were informed of this

23   homicide by Special Agent Jason Bennett.  We

24   immediately requested the victim's phone number.

25   Upon looking at that phone number we knew for a fact

1    that he was set up and killed by members of the same

2    fraudulent document organization we were

3    investigating in Virginia.

4    Q    Now, through that toll analysis did you,

5    including the wire intercepts and analysis, did you

6    get an idea of Israel Cruz Millan's habits in using

7    phones, and how long he would keep them?

8    A    Cruz Millan got -- we have probably more than a

9    dozen phones where we have attributed to him during

10   the investigation.  He would regularly, I mean he

11   may have a phone a month, six weeks, but regularly

12   drop the calls, drop them, get a new one.  There

13   were multiple occasions where he had -- in fact it

14   was, I would say, regular for him to have two phones

15   at one time.

16   Q    Take a look at Government's exhibit number 9.

17   Are these telephone summary charts you prepared on

18   the target cell phones that have been tied to Israel

19   Cruz Millan?

20   A    Yes, sir.

21       MR. GILL:  We move the admission of

22   Government's exhibits 9.

23       THE COURT:  They will be admitted.

24   BY MR. GILL:

25   Q    With respect to his habits that you are aware

1    of through the wire intercepts did Israel Cruz

2    Millan loan his phone to others, or did he, as far

3    as you know, maintain control and use of his phone?

4    A    I can't think of an instance ever where he did

5    not use -- someone else used his phone.

6    Q    Looking at page one of exhibit 9 that is on the

7    screen.  Describe for Judge Spencer what this shows

8    and the time range for that particular phone.

9    A    In order to make those 770,000 tolls visually

10   understandable, we compressed them into these

11   charts.

12        And you will see a pattern as we go through

13   each one.  This first one here shows target cell

14   number two, the first line that we intercepted Cruz

15   Millan using, (916) 310-7536.  And the date

16   represents the life of the phone.  This follows the

17   period of time that we intercepted, although we

18   intercepted within it.  But what we are showing here

19   illustrating is in-coming out-going calls, texts, or

20   essentially contacts with his cell managers.

21        As I said before, he was a micro manager.  He

22   was on top of these guys, talked to them quite

23   often.

24        Going into the circle at the time, these were

25   the cells operating the organization.

1          Starting at the top left.  Wilmington, North

2     Carolina.  Going right.  Little Rock, Arkansas.

3     Lexington, Kentucky.  Virginia Beach, Virginia.

4     Providence, Rhode Island.  All managers.

5          Phone, Raleigh, North Carolina.  Louisville,

6     Kentucky.  Michelon, Indiana, Richmond, Virginia.

7     Fayetteville, Arkansas.  Nashville, Tennessee.

8     Chelsea, Massachusetts, which is right outside

9     Boston.  Cincinnati, Ohio.  Manassas, Virginia.

10    Greensboro, North Carolina.  And St. Louis,

11    Missouri.

12    Q    Now, look at page two of exhibit 9.

13    A    Again, a pattern will develop here over the

14    next several exhibits.  But on this particular

15    target cell phone two, what is highly significant is

16    is we are seeing calls with the person who is the

17    leader of this organization in Mexico who we have

18    intercepts on.

19    Q    Is that first, at the top, the member, and has

20    a Mexican phone number?

21    A    That's correct.  That's correct.  Sorry.

22         And down here below we have Cruz Millan's

23    mother.  We have intercepts with him talking to his

24    mom where she clearly identifies him as her son.  He

25    identifies her as his mother.  And again, this will

 1    become more significant over the next two slides.

 2    Q    Okay.

 3         Then turn to page 3 of exhibit number 9.

 4    A    Again, you see the same pattern.  If we compare

 5    this to the very first one, these boxes have not

 6    changed.  They are in the same position and same

 7    color.  You compare them side by side, they are

 8    nearly identical.  I won't go through them all

 9    again, but he is again talking to all the cell

10    managers on the that new phone.  (804) 972-XXXX.

11    That date range is September 13 through November 9

12    of 1020.

13    Q    Look at page 4, which is also four target cell.

14    A    Again, seeing something that is highly

15    significant.  Talking to his mother on this phone.

16    Again, we have those intercepts, very clear.

17    Continue on?

18    Q    At the time he would have had this particular

19    phone target cell phone number 4, based on his

20    habits and how you know it works, would he have had

21    other lines as well?

22    A    Absolutely.  He did have another line, cell

23    phone number 5.  We intercepted them together.

24    Q    Look at the page.  Next page, which is page 5

25    of the exhibit.

1      A     You see the date range.  October 14 through

2      October 30.  This was his least-used telephone.  You

3      will see we are missing some boxes here.  Again, it

4      was the least-used phone, significantly, but you

5      will see the remainder of these other boxes are in

6      the same place, same color, and he is doing the same

7      communication with these cell leaders.

8      Q     Look at page 6, which is target cell phone

9      number 5 for the same date range.

10     A     Again, the same trend.

11           Leader in Mexico appeared at the top.  And,

12     again, his mother down here.  Again his mother's

13     phone number actually we were able to recover from a

14     VISA application that he issued for some years ago

15     that he listed that as his home number in Mexico.

16     Q     Look at page 7 of exhibit 9.  This target cell

17     phone number 6.

18     A     This is a cell phone we intercepted on

19     (910)443-7863, October 13th through November 18,

20     which was, of course, take-down.  And, again, you

21     will see the same boxes in the same places, same

22     colors.

23           This shows patterns, the persons, the people he

24     talked to no matter what phone he is using.

25     Q     And then the final page of that exhibit, page

Joseph – direct

```
 1     8.
 2     A    Again, leader in Mexico.  Down here talking to
 3     his mother.  And even more significant, these
 4     numbers, he talked to his mom on, out of 770,000
 5     tolls, in excess of 770,000 tolls, these numbers
 6     associated with Mrs. Millan are the only -- are only
 7     talking to phones that we know to be associated with
 8     Israel Cruz Millan.
 9     Q    Now, through your toll analysis, were you able
10     to identify the numbers you believe Israel Cruz
11     Millan was using at the time of the Arkansas murder?
12     A    Absolutely.
13     Q    Look at exhibit number 10.  Tell us what that
14     is.
15          If we could see page two of that.
16     A    Looking at the tolls.  The call activity
17     stemming from the victim in Little Rock, Arkansas,
18     which we will get to in a little bit.  The cell
19     leader, we were able to isolate this number, more or
20     less jumped out at us.  This number matched the same
21     call pattern as Cruz Millan.  We were not
22     intercepting at the time.  But the call pattern was
23     there.  Again, he is talking to all of his cell
24     managers, or the majority of them, at that time.
25     Q    The date range is what?
```

1    A     May 1st through July 12, 2010.

2          MR. GILL:  We move for admission of exhibit 10.

3          THE COURT:  It will be admitted.

4    BY MR. GILL:

5    Q     Look at page 2 or page 1.

6    A     So, of course, we looked at that and realized

7    it was a leader phone.  We dug in even more.  This

8    chart absolutely confirmed it.  Again, the leader in

9    Mexico, which anybody could have talked to, but,

10   again, this is a real convincing piece of analysis

11   that we discovered was Cruz Millan's mother, talking

12   to Mrs. Millan on that phone, really cementing the

13   fact that was in fact his phone.

14   Q     In fact, it has numbers on there.  Would those

15   reflect the number of contacts, roughly, back and

16   forth, 77 for one line tied to this number and 50

17   for another line?

18   A     That's correct.

19   Q     Now, let's look at exhibit number 11.

20         Agent, is this a summary of the numbers

21   connected to some key players back in July of 2010

22   In relation to the murder investigation?

23   A     Yes, it is.

24         MR. GILL:  Your Honor, we move admission of

25   exhibit eleven.

1          THE COURT:  It will be admitted.

2     BY MR. GILL:

3     Q    Generally describe this for us.

4     A    All right.

5          Cruz Millan, again we know using that number

6     (919)240-1780, again, Edy Oliverez-Martinez, the

7     gentleman convicted of the homicide.  He was also

8     cell manager, and then to his right, we have Armando

9     Gonzalez Medina, and Erik Martinez-Ortiz.  Those

10    were his runners.

11    Q    With respect to these three numbers below those

12    individuals, are those the ones through testimony at

13    trial from S. O. as well as contact information and

14    other avenues that they were identified as being

15    connected to those phones?

16    A    Absolutely.  These were in fact phone numbers

17    they used at that time.

18    Q    Now, look at exhibit number 12.  Tell us

19    generally what exhibit 12 is, Agent Joseph.

20    A    12.  This is what I refer to as toll records.

21    These are toll records.  These are specific reports

22    that we ran to isolate certain numbers.  What is

23    shown here is, we took the target cell phone number,

24    which belonged to Pascal Ramos, the victim of the

25    homicide.  And it shows contact.  This is what got

1     us going on the common link between that homicide

2     organization.  We see that Pascal Ramos received an

3     in-coming call right here on from Edy

4     Oliverez-Jiminez on the 4th of truly.  Three minute

5     conversation.  Followed by several other calls

6     throughout that day.  Some short in duration.  Some

7     long.

8     Q    Is page 2 included contacts between Edy

9     Oliverez-Jiminez number and the number that you

10    believe is connected to Cruz Millan?

11    A    Again, that was toll records isolating these

12    two numbers from a date range of July 4 of 2010

13    through July 6 of 2010.

14         MR. GILL:  We move admission of exhibit 12.

15         THE COURT:  It will be admitted.

16    BY MR. GILL:

17    Q    Sergeant -- Agent Joseph, I want to break this

18    up into three parts.  From the outset is it fair to

19    say that this summarizes calls between those two

20    numbers for the dates July 4 through July 6 of 2010?

21    A    Exactly what it is.

22    Q    Okay.

23         Beginning with July 4 tell us generally, do you

24    see any contact between those two numbers and in

25    relative close proximity to the time period that Edy

1    Oliverez-Jiminez was calling the murder victim on

2    page one of this exhibit?

3    A    Absolutely.  I mean, we see calls starting late

4    afternoon going into evening between Cruz Millan and

5    Edy Oliverez-Jiminez throughout the 4th, even going

6    into the 5th, as far as midnight.

7         He was also -- the chart we just showed,

8    between the victim and Edy Oliverez-Jiminez were in

9    that late afternoon, early evening time frame.

10   Q    Now, talk about July 5, which would have been

11   the day before the murder.  If you would take your

12   finger and drop it down the side on the far right of

13   the calls you are going to be talking about in

14   relation to that.  And particularly tell us about

15   the length of the calls at the end of that night,

16   the very night before the murder occurred.

17   A    Well, those were, of course, the two calls that

18   really got our attention.  As we are looking at the

19   call pattern activity between this number, which we

20   believe was highly important, both numbers of course

21   being important, but one being possessed by Cruz

22   Millan.  There is a substantial phone call late

23   night.  Not that late, but I guess 8:00 o'clock and

24   10:00 o'clock.  In duration 8 minutes 40 seconds, 6

25   minutes 32 seconds.

Joseph – direct

1   Q    Were there any other calls after that last

2   lengthy call that was at roughly 10:39 p.m. the

3   night before the murder?

4   A    No, there wasn't.

5   Q    In fact, now moving down to July 6 of 2010.

6   Tell Judge Spencer about the next calls that were

7   placed, and who was placing those calls.

8   A    Again, we are looking at the tolls of Edy

9   Oliverez-Jiminez.  He received an in-coming call on,

10  starting at 1:16 and followed again at 1:18.  Those

11  two time frames being extremely significant because

12  we know the testimony of Adrian Saha at trial, who

13  is a, with Pascal Ramos when he was assaulted.  That

14  the attack occurred at approximately 1:00 o' clock.

15  Q    This 1:18 call and the 1:16, are we going to

16  come back to those in just a moment?

17  A    Oh, yes.  Absolutely.

18  Q    Okay.

19       And then the final call for July 6 of 2010.

20  Length of that call?

21  A    We have an eleven-minute call, 11 minute 8

22  second call.

23  Q    Now, turn to exhibit number 13.  Fair to say

24  these are generally summaries of cell tower records

25  just right around the time of the murder?

Joseph – direct

 1    A     Yes.  These --

 2          MR. GILL:  We move admission of exhibit 13.

 3          THE COURT:  They will be admitted.

 4          THE WITNESS:  This chart was created by FBI

 5    Special Agent Creasy of the cellular analysis of the

 6    survey team in Washington, D. C.

 7    BY MR. GILL:

 8    Q     Before we get to the no connects, if you would,

 9    just tell us about the three pages that are

10    connected to that, and what they are for that

11    exhibit.

12    A     What number are we at?

13    Q     This is exhibit number 13.

14    A     All right.

15          What we are seeing here is --

16    Q     This on page two of exhibit 13.

17    A     Two, three and four.  I will summarize these

18    together to save time.

19          What these show, this is a map of Little Rock

20    Arkansas, specifically 9500 South Ice, represented

21    in the dead center here, which is, of course, the

22    abandoned trailer where the body was discovered.

23          What this chart and these three charts are

24    going to illustrate is what we all have when we use

25    our cell phones, specifically at our home regarding

Joseph – direct                                    38

1    patterns of life.  We all have essentially a home

2    tower.  Our phone, all our phones are built, or they

3    connect to the closest geographical tower, like to

4    wherever we are, like our home if -- where we make

5    the majority of our calls.

6         This chart shows that the base line, it is the

7    address is, has actually two home towers which is

8    going to be showed by this purple, as well as this

9    blue one over here.  You can see the base line road

10   is located in the middle of those two towers.  Even

11   more closely you can see it is almost identical

12   geographic distance to the two towers.  Showing that

13   it would not only be -- I mean it would be

14   absolutely typical, it would be regular that this

15   phone would regularly bounce off of these two towers

16   when making phone calls.

17   Q    And do those pages 2, 3, 4, show connections

18   with the phone numbers associated with Edy

19   Oliverez-Jiminez, Armando Gonzales Medina, and Erik

20   Martinez-Ortiz as connecting with those covering the

21   murder location in the times leading up to and times

22   after the murder?

23   A    Per Agent Creasy's testimony and analysis it

24   shows that those three individuals were extremely

25   high probability they were located within that

1      overlap during the time of the homicide, and both a

2      little before and after.

3      Q    Look at page one of exhibit 13.

4      A    All right.  Again, this is -- this is a chart

5      showing what they refer to as cell phone world, as

6      no connect.  We have all had a phone call we placed

7      and before we hit the button it doesn't go or

8      somebody says they tried to call us and it just

9      doesn't go through.  That occurs when the phone has

10     no signal or the phone is turned off.

11          What this chart shows is there is very, very

12     strong indication that those phones were turned off

13     at the time that Pascal Ramos was abducted and

14     assaulted and killed.

15          There is one very significant exception in this

16     black zone right here on this.  It is call 136.  It

17     shows --

18     Q    The asterisk down below, what does it show?

19     A    It says at 1:18 p.m. Edy Oliverez-Jiminez

20     received a 50-second phone call from (919)240-1780,

21     Cruz Millan, which did go through and did hit off

22     the home tower.

23     Q    So that is shown by that middle row, no

24     connects from 12:00 o'clock to 2:00 o'clock p.m. at

25     the time of the murder.  All three phones connected

```
 1   with those individuals we believe were on the

 2   ground, were turned off, were not able to receive

 3   calls that were coming in with that one exception?

 4   A    One exception.

 5   Q    Now, then, were you able to confirm Israel Cruz

 6   Millan's role in the aftermath of the murder, you

 7   know, what did he do with respect to the cells?

 8   A    Following the homicide he ordered Edy

 9   Oliverez-Jiminez, Armando Gonzalez Medina and Erik

10   Martinez-Ortiz to leave Little Rock.  Sent them to

11   Virginia.

12   Q    Take a look at exhibit number 14.

13        MR. SRISKANDARAJAH:  Objection.  Sorry.  To be

14   clear, I object to the statement that he ordered

15   them to leave.  There is absolutely no evidence he

16   ordered them to leave.

17        THE COURT:  All right.

18   BY MR. GILL:

19   Q    Agent Joseph, is this summary of the movement

20   that you found based on cell tower records, cell

21   ledgers, and testimony?

22   A    Exactly what this is.

23        MR. GILL:  Your Honor, we move admission of

24   exhibit 14.

25        THE COURT:  It will be admitted.
```

1    BY MR. GILL:

2    Q    Please look at page one.

3    A    Just a simple chart showing exit from Arkansas

4    to Virginia on these dates.  Again, confirmed by the

5    cell towers, the cell tower analysis, the ledgers,

6    and the testimony of several phone records -- this

7    shows July 16, talking about the departure date,

8    arrival in Virginia on July 23rd.

9    Q    Look at page two.  Goes further to show that a

10   swap, a switch, did take place on July 26th

11   consistent with, again, testimony, cell tower

12   ledgers, Alphonso Alcaraz-Palomares, Ricardo Patino

13   left Virginia with his runner, J. M. M., and

14   arriving in Little Rock on or about July 29 of 2010.

15        In fact, did J. M. M. testify at trial about

16   this switch?

17   A    He did.

18        MR. GILL:  Your Honor, I turn The Court's

19   attention to exhibit 17 pages 43 and 46.

20        Page 43, J. M. M. testifies about seeing Edy

21   Oliverez-Jiminez when he arrives in Virginia Beach

22   on the same day that he and Ricardo Patino left to

23   go to Arkansas.  And that occurred at a Food Lion.

24   And then on page 46 the question was asked, "When

25   you saw Arasmo at the Food Lion at the end of July,

1    where had he come from?

2         "Answer:  Well, I believe from Arkansas to

3    Little Rock.

4         "Question:  On the same day you saw Arasmo at

5    Virginia Beach did you see anybody else that you had

6    met in Little Rock the the first time you came in?

7         "Answer:  I think Peruse was there."

8         Who is Persue?

9    A    Eric Martinez-Ortiz.

10   Q    "Question:  Where did you see Peruse?

11        "Answer:  When we left we went to Wa Wa, and I

12   believe I saw Muerto there."

13        In fact we have his testimony at trial and in

14   debriefs, did he also talk about admissions that

15   were made by Martiniz-Ortiz about what happened in

16   Little Rock during that meeting at the Wa Wa?

17   A    He did.

18   Q    Were there also wire intercepts that were

19   retrieved through court-authorized wire taps that

20   referenced, you know, the July 6 of 2010, you know,

21   murder.  In very general terms, but also the switch

22   that we have been talking about?

23   A    Yes, there were.

24        MR. GILL:  Your Honor, I turn The Court's

25   attention to exhibits 15 and 16.

1      We move for admission of both those at the

2  time.

3      THE COURT:  They will be admitted.

4  BY MR. GILL:

5  Q    And first with respect to exhibit 15, Agent

6  Joseph, if you would tell us who is on that call and

7  when it occurred.

8  A    This is call between Edy Oliverez-Jiminez and

9  Pableto or Armando Gonzalez Medina.  That call

10  occurred September 15 of 2010.

11  Q    Turn your attention to the bottom of page 3.

12  Beginning at line 40, and then going to go over to

13  page 4 down to about line 27 or 28.  If you would,

14  you know, using that as reference, explain to Judge

15  Spencer what it is that is going on in this

16  conversation.  What are they talking about?

17  A    To me they are talking about there was an

18  incident.  They were referring to something that --

19  an incident they had both.

20      MR. SRISKANDARAJAH:  Judge, I object.  He

21  doesn't know.

22      THE COURT:  Okay.

23  BY MR. GILL:

24  Q    Agent Joseph, with respect to that conversation

25  beginning on page 3 Daniel is Edy Oliverez-Jiminez?

1    A    That's correct.

2    Q    And Pableto is Armando Gonzales Medina?

3    A    Yes, sir.

4    Q    Beginning on that page they are talking about

5    Pinya.  And Pinya doesn't "give a shit."  Who is

6    Pinya in relation to this, these individuals?

7    A    Pinya was Alfonso Alcaraz Palomares, who at the

8    the time of the call was cell leader in Little Rock

9    Arkansas.

10   Q    Pableto, Armando Gonzales Medina, says "They

11   are back, because," and then the next page, page

12   four, "Daniel," Edy Oliverez-Jiminez, says, "but

13   you" -- Pableto says, "What about me?

14        "Daniel:  You were the one who wanted to kick

15   those guys ass."

16        Pableto says, "You dude, you were there, too,

17   don't bull shit.  No fucking."

18        Muerto said "that -- and fuck it, whoever

19   doesn't can leave.  But either way he sent all of us

20   to hell, dude."

21        Based on the context of the conversation and

22   your knowledge of the investigation --

23        MR. SRISKANDARAJAH:  Judge, again --

24        THE COURT:  Sustained.  It is what it is.

25   BY MR. GILL:

Joseph - direct

1    Q    Beneath that it refers to being sent where they

2    were sent, South End, Lafayette and other places.

3         And, Your Honor, I will have The Court read

4    that segment.  I am sorry.

5         THE COURT:  All right.

6    Q    Okay.

7         And then let's talk about exhibit 16.  Tell us

8    about who the participants are in this conversation

9    and the date.

10   A    This call occurred November 10 of 2010.  Call

11   between Israel Cruz Millan and Edy Oliverez-Jiminez.

12   Q    We are gong to play a short portion that goes

13   from roughly line 30 on page four and continues over

14   to page 5 line 15.

15                   (CD being played).

16   Q    In that conversation there is a reference to a

17   guy that was left over in Little Rock.  Putting

18   aside that conversation, are you aware of anyone who

19   was left over --

20   A    Absolutely.

21   Q    -- during the murder?

22   A    Absolutely.

23        MR. SRISKANDARAJAH:  Judge, I would submit to

24   The Court this is again, as The Court stated, it is

25   what it is.

Joseph – direct

1        THE COURT:  No he can talk about it.

2        THE WITNESS:  He was a juvenile victim with

3    Ramos at the time of the assault and homicide and

4    testified at trial in November.  He survived.

5    Q    Now, I want to turn to Nashville, Tennessee.

6    Agent Joseph tell Judge Spencer who was in charge of

7    that cell leading up to the time of a take-down, and

8    generally what was going on in Nashville just before

9    the take-down.

10   A    These calls were to the guy who was running the

11   cell out there in Nashville.  Very clear from the

12   intercepts they were having major issues of

13   competition.  They were -- these calls are about

14   cleaning against the competition, leading up to,

15   fortunately, take-down November 18, which actually

16   stopped the attack on them.

17   Q    Your Honor, we move the admission of exhibit 20

18   and 21, which are the wire intercepts related to

19   events occurring in Nashville, Tennessee.

20       THE COURT:  They will be admitted.

21   BY MR. GILL:

22   Q    And we are going to play exhibit number 20.

23       Before that starts, what is the date of this

24   call?  Who is on that call?

25   A    Again, it is Cruz Millan on the target phone,

1    six conversations with Yvonne Rock Curry, Sam,

2    November 11.

3    Q    At this point, Agent Joseph, did you see

4    anything in your investigation that mirrored up with

5    other patterns you had seen with this organization?

6    A    Two things immediately popped up.  Talked about

7    prepaid phone, getting a phone and then when Cruz

8    Millan referenced finding an empty house to have a

9    party.  So very consistent with the Richmond assault

10   as well as what occurred.

11        MR. SRISKANDARAJAH:  Judge, I object again.

12   There is evidence that leads −− to make that leap.

13        THE COURT:  No, he can testify.

14                 (CD being played).

15   BY MR. GILL:

16   Q    Okay, Agent.

17        Let's turn to exhibit 21, which we are not

18   going to play for The Court, but we ask Your Honor

19   to turn to page two.  That is a very short call.

20        To move things along, Agent Joseph, describe

21   for us in this call between Muerto the defendant and

22   Feo, the manager in Nashville, November 14 or 2010.

23   Who they are talking about and what, based on your

24   knowledge and context of the conversation, this

25   refers to.

1    A    Again, short conversation following

2    November 14, following the previous intercept.

3    Talks about, references who we determined are

4    enforcers, cleaners in the organization.  Pretty

5    much going, talking, the talk is proceed with a

6    mission, proceed with the cleaning, competition,

7    clean-up competition.

8         It also says, referenced they are going to make

9    sure they take the machine with them.  Which would

10   be consistent with what we have seen on other acts

11   of violence perpetrated by the FEO.

12   Q    Being the printing equipment, the machine?

13   A    That's correct.

14   Q    Let's talk about events that occurred in

15   Kentucky, September 24 through 26 of 2010.  Take a

16   look at exhibit 25.  Is this a summary of selected

17   calls as well as the actual transcripts for those

18   calls?

19   A    Yes, sir, it is.

20        MR. GILL:  Your Honor, we move admission of

21   exhibit 25.

22        THE COURT:  It will be admitted.

23   BY MR. GILL:

24   Q    If you would describe for Judge Spencer who the

25   players are, and generally what is going on in that

1      area from September 24th to 26th of 2010.

2      A     Again we are looking at another act of violence

3      between Cruz Millan and the Louisville cell leader,

4      Ramirez and -- just to go through the high points?

5      Q     The high points.  And the first call is

6      September 24th of 2010 at 3:39 p.m. between those

7      two individuals?

8      A     Again, this is specifically reference's

9      competition.  I am going to read, for time's sake,

10     go over some main point.

11          The number you guys gave me belong to the

12     competition.  Okay.  Reference competition Ramirez,

13     you know, says, no, no, that is the one of the

14     competition.  Again, very clear they are talking

15     about problems they have had very consistent through

16     out the organization.  Further on the same call,

17     competition works here.  Ramirez has their license

18     plates already.  He knows the cars, everything.

19     Q     Then on page two at the top.

20     A     Muerto says, you know, well, they are going to

21     kick their fucking ass right now.  So that is the

22     phone number.  Again, all comes back to phone

23     numbers vetting out the competition.  Wants to know

24     if in fact it is legitimate.  And they move forward.

25     Q     And then next the call that occurred on

1        September 26 of 2010 at 12:17 p.m. Between the

2        defendant and Kevin Ramirez?

3        A     References competition.  References printer

4        used by the competition.  Talks about having a bat

5        in the car.  You know, talking about assholes they

6        are dealing with.  Muerto replies, yes, 'bro.  And

7        long screwdrivers.  Kintano says further in the

8        call, we are carrying a tool box and the knives in

9        the tool box, and has them at hand for when they

10       encounter these guys.

11       Q     Continuing over to page three.

12       A     Kintano Ramirez says, we have a machine there

13       so they can do illegal documents and are selling it

14       for $5,000.

15             Going down to the bottom.  We will be alert.

16       Get that address, even better.  This is the way --

17       this way we will go after that asshole.

18             Very malicious, very direct and --

19             MR. SRISKANDARAJAH:  Judge, I object.  Judge --

20             THE COURT:  Sustained.  Don't editorialize.

21             THE WITNESS:  Yes, sir.

22       BY MR. GILL:

23       Q     And then next call, bottom of the page,

24       September 26 of 2010 at 12:21 p m.

25       A     Continuing the conversation on the competition.

1    Bringing the bats.  Ramirez says, bring the bats.

2    Says bring the bats.  Honestly it is hot right now.

3    Honestly the police is really hot right now.

4    Q    And then turn to page 4, September 26 of 2010,

5    call at 12:33 p m between the defendant and again

6    Kantano Ramirez.

7    A    Again, reference the city where this

8    competition exists.  Down a few lines.  Muerto

9    references, the thing is, we are going to capture

10   the competition in Covington.  Covington is a city

11   in Kentucky.

12        Muerto continues.  Yes, we already know where

13   the house is.  So there has been work from the very

14   first call to this point that they have been digging

15   up this information and figuring out.  And goes on

16   to talk about the actual operation.  Muerto suggests

17   that, they actually instruct --

18   Q    Turn to page five.

19        Generally explain for us what the discussion is

20   and the importance of a woman to the operation that

21   measures up to what happened other places.

22   A    Muerto instructing Ramirez to find a Mexican

23   girl, which I understand and have understood through

24   the investigation they find a female to make the

25   call to buy counterfeit documents.  Females simply

1    is unassuming, it is less memorable, they --

2         MR. SRISKANDARAJAH:  I object to that.

3         THE COURT:  Sustained.  We can get through this

4    a lot quicker if I do the analysis and not the

5    witness of the evidence.  All right.  So let's -- I

6    can read it.  I understand.

7         MR. GILL:  Okay, Your Honor.

8         Then, Your Honor page 6.  I won't have the

9    agent testify about that, but that is the conclusion

10   of the conversation.

11        THE COURT:  All right.

12   BY MR. GILL:

13   Q    Let's talk about Agent Joseph, Boston,

14   Massachusetts, and what was happening in Boston

15   October 10 through 12th of 2010.

16   A    Summary is very similar to the call that we

17   just, series of calls we talked about.  The Boston

18   group encountered some competition significantly

19   underselling.  They were selling the documents for a

20   hundred dollars, which would have been $60 less than

21   what Cruz Millan's organization was selling them

22   for.

23   Q    Okay.

24        Your Honor, we move for the admission of

25   exhibit number 26 which is the summary of selected

1    excerpts as well as the transcripts underlying those

2    excerpts.

3    A     They will be admitted.

4          MR. GILL:  Generally with respect to Boston,

5    Your Honor, I could have him testify or generally

6    what happened at the conclusion, or give The Court a

7    moment to read through those.  However you would

8    like to proceed.

9          THE COURT:  I will read them.

10         MR. GILL:  Okay.

11         We are getting close to the end.

12         THE COURT:  All right.

13   BY MR. GILL:

14   Q     Okay.

15         Then, Agent Joseph, I now want to talk to you

16   about the amount of documents moved by the

17   organization and money laundering.

18         First off, describe for Judge Spencer during

19   the investigation were you and the other lead

20   investigators able to derive an estimate of the

21   number of documents being moved by the organization?

22   A     Yes, sir.

23   Q     What information did you rely upon, and what

24   number did you come up with?

25   A     Following the enforcement activity, and after

1    analyzing the results, items seized from search

2    warrants, combined evidence found, analysis of the

3    ledgers, financial work showing volume of wire

4    transfers sent, other expenditures, tabulated the

5    organization very conservatively sold 15 to 20,000

6    counterfeit documents annually.

7    Q    Agent Joseph --

8         MR. SRISKANDARAJAH:  I object to that.  The

9    reason being is that the cross over, what they look

10   at, what they give this Court, has no criteria or

11   formula that they used to come up with that number.

12   They look over this -- they looked over that, and

13   then they come up with a number.  There is

14   absolutely no foundation for number, other than

15   their own --

16        THE COURT:  You can inquire into the specifics

17   in your cross examination.  I understand what it is.

18   It is an estimate, and I will receive it.

19        Go ahead.

20   BY MR. GILL:

21   Q    Look at exhibit number 27.

22        And, Your Honor, we move for admission of

23   exhibit 27, which is the analysis based on ledgers

24   received in the investigation.

25        THE COURT:  They will be admitted.

1    BY MR. GILL:

2    Q    Agent, please explain what we are looking at

3    and how this chart was --

4    A    This is a breakdown of our more long-term

5    cells, the analysis of the ledgers that we recovered

6    on the search warrants on November 18.

7         On the left side shows the cell.  In the middle

8    shows the date range covered by that ledger.  The

9    middle here shows the approximate, or exact number

10   of documents found, counted, tabulated, from these

11   ledgers.  We broke that down by average document

12   sold a day and multiplied by the days of the year,

13   giving us an approximation of annual documents sold.

14   That number totals 18,354 documents, which would

15   have been right in the middle of our range, our

16   conservative estimation of 15 to 20,000 annually.

17   Even more significant to that is we excluded five

18   other cells from the equation.

19   Q    Are those the cells there?  Scroll down.  Those

20   sales listed at the bottom, those weren't included

21   in this analysis?

22   A    Correct.

23   Q    Are some of those cells actually very active,

24   but we didn't recover the ledgers?

25   A    Absolutely.  Raleigh was as large, or second to

1    Richmond in size.

2    Q    Finally, with respect to the accuracy of the

3    numbers that would have been in the ledgers that

4    were counted, how accurate are the numbers in those

5    ledgers?

6    A    Oh, the numbers in ledgers are incredibly

7    accurate.  They had to be accurate or they were

8    subject to audit, and disciplined by Cruz Millan.

9    Q    Now then, through the investigation were you

10   able to identify Western Union as being used to

11   transfer some of the proceeds of the organization

12   back to Mexico?

13   A    Yes, sir.

14   Q    How was it you were first able to identify that

15   connection?

16   A    Within the first week of interception Special

17   Agent Joe Clements, another co-case agent in charge

18   of the financial investigation, he immediately was

19   able to essentially crack the code on, through these

20   intercept text messages, wire communications as

21   well, breaking down the exact method that these guys

22   were using to send money.  It all centered around

23   the Western Union transaction number.

24        Further, you know, it involved the amount, the

25   specific amounts that were sent.  And the

1    spending –– they were sending.  He was able to find,

2    again, very conservative estimate, over a million

3    dollars, a little over a million dollars wired to

4    Mexico in a three-year period.

5    Q    Thank you.

6         Government's exhibits 28 is the total analysis

7    you just described, including the back-up

8    documentation for the Western Union transaction?

9    A    This is the work Agent Clements has prepared;

10   that is correct.

11        MR. GILL:  We move admission of exhibit 28.

12        THE COURT:  It will be admitted.

13   BY MR. GILL:

14   Q    Does exhibit 28 include the numbers for

15   basically the transactions that were intercepted off

16   the wires?

17   A    It does.  $54,230.

18   Q    And then transactions that were identified

19   through analysis of significant telephone numbers

20   that were identified as being enterprise phones

21   during the investigation?

22   A    It does.  $421,447.

23   Q    Finally, an amount that was determined based

24   off the common recipients that were identified in

25   Mexico who would have been receiving these

Joseph – direct

1    transfers?

2    A    Yes, sir.  $571,800, or $864.

3    Q    Grand total of January 1 of 2008 through

4    November 18 of 2010, $1,047,541 and one penny?

5    A    That is it.

6    Q    Now, finally was the defendant Israel Cruz

7    Millan interviewed November 18 of 2010?

8    A    He was.

9    Q    Was -- did he waive his Miranda rights and

10   agree to talk to investigators?

11   A    He did.

12   Q    Was there an FBI agent who is fluent in Spanish

13   interpreting?

14   A    Yes, sir.

15   Q    I want to get a couple aspects of that

16   interview.  Number one, what did he claim as far as

17   how long he had been the leader of this

18   organization?

19   A    He said that he assumed command around August

20   of 2010.  So it would have been, he would have,

21   according to his debrief he rose to the level of

22   leader from never being involved in the organization

23   in August and assumed control of the group.

24   Q    In fact, during that interview did he claim

25   prior to August of 2010 that he had not been

Joseph – direct

1    involved with this group?

2    A    He advised he came here in late spring, was

3    buying cars here and transporting them to Mexico and

4    selling them across the border.

5    Q    Did he make admission during that interview

6    with respect to use of Western Union to send money

7    back to Mexico?

8    A    He did.

9    Q    How much did he admit to his being responsible

10   to move on a bi-weekly basis?

11   A    He was demanded to send back to Mexico 15,000

12   every two weeks, which was incredibly consistent

13   with what Special Agent Clements discovered in his

14   financial investigation; almost to the number.

15   Q    In fact, does that work out to roughly, based

16   off the defendant's own number, $360,000 per year?

17   A    That's correct.

18   Q    Was he also interviewed about whether violence

19   was used internally in the organization?

20   A    He was asked.

21   Q    Tell Judge Spencer what he said with respect to

22   use of violence.

23   A    Initially said violence was not used in the

24   organization.  That if somebody was caught stealing

25   they would be kicked out of the group, and that

Joseph – direct                                   60

1   other people handled competition.

2   Q    Was there anything that happened during the

3   interview that changed his view on that answer?

4   A    Absolutely.

5        Special Agent Clements played a -- the

6   recording, the intercept of the calls that we heard

7   regarding the Raleigh beating.  At the time he

8   played it Special Agent Clements informed me that

9   Cruz Millan's body shrugged, slumped, dropped his

10  head, and then recanted his statement that violence

11  was in fact used.

12  Q    Generally, what did he say was going on in

13  Raleigh, North Carolina?

14  A    He said that the victim was Chingo -- we heard

15  Chingway -- Chingo was being punished, but he wasn't

16  the primary assaulter, he was -- it was mostly being

17  done by guys named Perone and Yucca, the enforcers,

18  and he actually stopped the beatings, the assault,

19  because he didn't feel it was right.

20  Q    Did that conflict with other aspects of your

21  investigation?

22  A    Which?

23  Q    That answer.

24  A    Inconsistencies were throughout.

25  Q    No further questions, Your Honor.

Joseph – cross

```
 1          THE COURT:  All right.
 2                      CROSS EXAMINATION
 3     BY MR. SRISKANDARAJAH:
 4     Q     Thank you, Your Honor.
 5           The Court's indulgence, Your Honor.
 6           Agent, you said that Mr. Millan was the head of
 7     the organization.
 8     A     Domestically.
 9     Q     Domestically.
10           But you do admit that he got all of his orders
11     from the person in Mexico?
12     A     I wouldn't say all of his orders.
13     Q     Isn't it true that you were advised by
14     Mr. Millan that he did, he only did what he was told
15     to do?
16     A     That might be what he said in the debrief, but
17     we intercepted calls with an individual who was
18     clearly the leader in Mexico.  He did hand down
19     instructions.  Cruz Millan also took care of a lot
20     of the -- the ledgers, significant other daily
21     operations on his own.
22     Q     But the objectives were handed down by the boss
23     in Mexico; correct?
24     A     On occasions they were.
25     Q     Okay.
```

Joseph – cross

1          Now, turning to Little Rock.

2          Isn't it true that nobody at no point has tied

3     Mr. Millan to the Little Rock.  That was the

4     co-defendant.

5     A    As far as being physically present?

6     Q    Yes.

7     A    No, he was not physically present.

8     Q    In fact, nobody has said that Mr. Millan even

9     really knew about the incident prior to it occurring

10    in Little Rock; isn't that true?

11    A    Repeat that for me one more time.

12    Q    None of the co-defendants have made any

13    statements that Mr. Millan knew about the incident

14    of Little Rock prior to it occurring?

15    A    No, sir.  We have not received direct firsthand

16    knowledge that anyone knew that he knew about it

17    beforehand.

18    Q    Do you agree with me?

19    A    That is correct.

20    Q    Okay.

21         Turning to the questioning of Mr. Millan when

22    he was in custody.  At no point he admitted to any

23    involvement with Little Rock.

24    A    As far as daily operations or the homicide?

25    Q    The homicide.

Joseph – cross

1    A    That's correct.

2    Q    And you do admit that after some initial denial

3    he did admit to the Raleigh incident, right?

4    A    He kind of had to.

5    Q    I understand that.  But never at any point did

6    he make any admissions as to being involved with the

7    homicide in Little Rock?

8    A    No, he did not.

9    Q    Okay.

10        On the transcript on page 49 J. M. M. clearly

11    states Cruz Millan did not know about it; correct?

12    A    That is what he testified to.  I don't believe

13    he would ever know.  He was a runner.  There was a

14    clear, defined, role, responsibility.

15    Q    But J. M. M. did not --

16    A    He would not be privy to that information.

17    Q    Okay.

18        You said that he is a micro manager.  That is

19    solely because he simply used to make frequent

20    contact with other people involved in the

21    organization; correct?

22    A    Far more than that.  These weren't social

23    conversations.

24    Q    Okay.

25        Let's turn to what is marked as government's

1    exhibit 12.

2         If I could get that second page, please.

3         With the exception of one call coming in from

4    Mr. Millan, all the calls are going out; right?

5    A    No, these are tolls based off of the 3799 on

6    the left.  So we have based off of 3799 received

7    from Cruz Millan an "N" next to it, incoming, that

8    he received 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12,

9    13, 14, 15 in-coming calls.

10   Q    Let me phrase it another way.

11   A    Okay.

12   Q    Can you pinpoint as to exactly what time the

13   physical act took place?

14   A    Right, approximately 1:00 o'clock.

15   Q    1:00 o'clock.

16   A    Let me put it this way.  He entered the trailer

17   around 1:00 o'clock.

18   Q    All right.

19        But, you weren't able to have a wire tap on any

20   of these phone calls, right?

21   A    That is before we intercepted any phone.

22   Q    Okay.

23        You also talk about what, who is known as

24   Sanchez-Acosta.  Isn't it true that Mr. Acosta told

25   you that "mission" could be a variety of different

1    things?

2    A    I believe so.  I am not sure.  Are you

3    referring to debrief or referring to his testimony?

4    Q    To a debrief.

5    A    I was -- he was debriefed multiple times.  I

6    believe that is what he said.  I can't be a hundred

7    percent sure.  I wasn't there for all of them.

8    Q    Okay.

9         Your Honor, may I have this handed to --

10        THE COURT:  Sure.

11   Q    -- the witness?

12        Agent, could you please state to the The Court

13   what were the definition of "mission" given to you

14   by Mr. Acosta?

15   A     This is accurate as far as what he told, and

16   what we heard off the intercepts.

17   Q    There were at least three sets of -- would you

18   read this for The Court?

19   A    Word for word?

20   Q    Please.  Just the highlighted portion.

21   A    Okay.

22        The investigative report 122.  "Sanchez-Acosta

23   explained that a mission could be defined as a -- in

24   a number of different ways.  A mission could be when

25   Cruz Millan asked for money or when a runner was

```
 1      sent to another state to deliver something, or when

 2      a machine broke and the jobs would have to be made

 3      in another state."

 4      Q    No mention of "violence?"

 5      A    Not in the specific instance, no, sir.

 6      Q    All right.

 7           Thank you.  If I may have that back.

 8      A    Certainly.

 9      Q    Isn't it also true that Mr. Acosta in his

10      debriefing made multiple versions of what happened

11      in Raleigh?

12      A    Any specific instance you are referring to?

13      Q    In the first debriefing said he wasn't even

14      present; correct?

15      A    Sir, without the report in front of me, if that

16      is what the report says, then maybe that is

17      accurate.  I don't have the report in front of me.

18      I am not comfortable testifying to that.

19      Q    Okay.

20           Court's indulgence?

21           THE COURT:  Sure.

22           MR. SRISKANDARAJAH:  Your Honor, may I have

23      these two reports handed to the agent, please?

24           THE COURT:  All right.

25      BY MR. SRISKANDARAJAH:
```

```
 1    Q    I will start with this one.

 2         Agent in that debriefing, that was the first

 3    debriefing of Mr. Acosta?

 4    A    This was the first time he talked to agent.  He

 5    talked to Bennett and Agent Rebe down in Little

 6    Rock.

 7    Q    In that he states that he was not even present.

 8    He left Raleigh before the incident; correct?

 9    A    That is what the witness says.  And I believe

10    from what I recall there were major inconsistencies

11    throughout this particular debrief, which would not

12    be at all uncommon to any of the other --

13    Q    That is not what I asked you.  But he did state

14    that he was not present at the Raleigh incident;

15    correct?

16    A    I believe so.

17    Q    And then how many other debriefings did you

18    have with him?

19    A    Maybe two other ones.  Potentially two or three

20    maybe.

21    Q    Okay.

22         It was only after the third one, it was only

23    during the third one you finally got a different

24    picture from what he originally told you in the

25    first one; correct?
```

Joseph – cross

1   A    Again, sir, I would have to re-read all these

2   reports.

3   Q    I will hand this to you.

4   A    Just so The Court understands, when was the

5   first debriefing, sir?

6        Sir -- oh first?  December 6 of 2010.

7   Q    And what is the date I just handed to you?

8   A    May 23rd, 2011.

9   Q    Okay.

10  A    Do you want me to read the whole thing?

11  Q    If that refreshes your recollection, isn't that

12  when he finally gives you a quote, unquote, debrief?

13  A    This was a far more thorough debrief.

14  Q    Okay.

15  A    Again, very, very common.

16  Q    Okay.

17       Could I have it?

18  A    Sure.

19  Q    So a substantial time after his original

20  statement to you, or to the agent, is when he

21  switches up his story; is that correct?

22  A    He gave a better version of his story, more

23  thorough version of his story.

24  Q    Okay.

25       With the exception of the statements made by

Joseph – cross

1    Mr. Millan about internal discipline, there is no

2    evidence that Mr. Millan was tied to any overt acts

3    of violence; correct?

4    A    Internally?

5    Q    Yes.  With the exception of internal violence.

6    A    I believe J. M. M. testified to the fact he was

7    present for internal.

8    Q    Not questioning --

9    A    External?  Was he linked to any external?

10   Q    Yes.

11   A    As far as his involvement, or actually being

12   physical --

13   Q    First of all, did --

14   A    I think overt is dictating and instructing

15   somebody to do something.

16   Q    Okay.  Was he physically present for anything?

17   A    Not that I am aware of.

18   Q    All right.

19        Turning to the ledger that you discovered.

20   A    Which one?

21   Q    The one that you all used to create your

22   analysis of how many documents were sent, or how

23   many documents were produced.

24   A    Referring to the exhibit that we compiled off

25   of the 15 or so different ledgers that we recovered?

Joseph - cross

```
 1    Q    Yes.

 2    A    Okay.

 3    Q    Have you ever been able to -- whose handwriting

 4    was on those ledgers?

 5    A    We have not done a handwriting analysis on any

 6    of them, exemplars.

 7    Q    Now, you don't deny that in the past people,

 8    different members of the organization, have done or

 9    made fraudulent statements to Mr. Millan; correct?

10    A    They may have.  I don't really know.  All I can

11    testify to is what we heard on intercepts.

12    Q    Certainly there were instances where people

13    were stealing, lying about making sales; correct?

14    A    No, sir, not that jumped out at us.

15    Q    Okay.

16         The only -- the one thing you can conclusively

17    state based on Mr. Millan's statement himself is

18    that he was required to send across 15,000 every two

19    weeks?

20    A    Every two weeks.

21    Q    Okay.  That would be the only thing you could

22    rely on to make a determination as to how much money

23    he sent across?

24    A    No, absolutely not.

25    Q    Well --
```

Joseph - cross

```
 1      A     Financial affidavits, financial write-ups,

 2      detailed the wire transfers associated with the FTO

 3      sent to Mexico over a three-year period totaling

 4      conservatively in excess of a million dollars.

 5      Q     Were they all done by Mr. Millan?  Were all the

 6      monies sent across by Mr. Millan?

 7      A     The write-up slows initially on the first page

 8      the amount.

 9      Q     I understand.

10      A     I don't know.

11            The amount shows $54,230.  These are the

12      actual, we heard him involved in the intercepts.  We

13      know that for sure.  These other ones -- again,

14      Special Clements composed this in great detail.  It

15      shows, the formula he came up with, the pattern, the

16      analysis.  Everything in here is corroborated off of

17      what they did, how they operated, who sent it, who

18      received it.

19            THE COURT:  The question was a simple one.

20      Each one of these transactions had to be approved by

21      him?

22            THE WITNESS:  Directly, no.

23            THE COURT:  All right.

24      BY MR. SRISKANDARAJAH:

25      Q     Thank you.
```

Joseph – redirect

1        Last question, sir, is, at no point, at no

2   point during any of your debriefings of Mr. Millan

3   or anyone else, nothing tying him to Little Rock

4   other than phone calls, that you have no knowledge

5   of what was said on those phone calls.

6   A    I believe I answered that already, that's

7   correct.

8   Q    Okay.

9        Nothing further, Your Honor.  Thank you.

10       THE COURT:  Anything else from the government?

11       MR. GILL:  Briefly, Your Honor.

12                    REDIRECT EXAMINATION

13   BY MR. GILL:

14   Q    Agent Joseph, first with respect to Dorien

15   Sanchez-Acosta.  The interview that is referenced by

16   the defense, the first interview that occurred

17   following his arrest.  Was he cooperating at that

18   time?

19   A    Not as far as through coordinated with the U.S.

20   Attorney's office or anything.  He reached out to an

21   agent.

22   Q    And then the second debriefing that I pointed

23   to that occurs on May 23rd of 2011, was that at a

24   point that he was cooperating and under a plea

25   agreement and actually sat down for the first time

1      with you and other investigators to talk about what

2      happened?

3      A     Absolutely.  If I recall correctly, he had

4      counsel present.

5      Q     Is it uncommon in your experience that

6      individuals when they are first arrested that they

7      are not completely truthful about what happened?

8      A     Extraordinarily common.

9      Q     Now, you were being asked about whether there

10     were other, specifically other individuals who have

11     been interviewed who referenced the defendant's

12     involvement in other acts of violence against

13     members internally.  Are you familiar with J C V who

14     was interviewed in this case?

15     A     I am.

16          MR. SRISKANDARAJAH:  Judge, I am going to

17     object.  That is not what I asked.  I specifically

18     asked only as to external.  Not internal.

19          THE COURT:  This relates to internal?

20          MR. GILL:  It does.  I believe he asked him.

21          THE COURT:  No, that is conceded it is

22     internal, so there is no --

23     BY MR. GILL:

24     Q     And then finally with regard to external, are

25     you aware of J C V describing events that occurred

1    in Cincinnati, Ohio where the defendant was

2    involved?

3    A    Yes, sir.

4    Q    Generally describe that for us.  J C V was

5    ordered to go to Cincinnati where one of their own

6    had been assaulted by a competitive group.  Actually

7    badly hurt.  And I believe their equipment may have

8    been also stolen.  JCV went out with other FTO

9    members and stayed in a hotel that was provided by

10   Cruz Millan.  The mission or the instructions were

11   to find the phone numbers of the other document

12   sellers or manufacturers so they could retaliate.

13        MR. SRISKANDARAJAH:  Objection, again, to that

14   statement, Judge.  I don't believe there was any

15   evidence that they could substantiate.  Simply, I

16   believe that the evidence would show that just to

17   get the phone numbers.  Nothing beyond that.

18        THE COURT:  All right.  I hear you.

19   BY MR. GILL:

20   Q    Agent, I turn your attention to the report

21   regarding that interview.  Page 5.  The J C V

22   providing details with respect to, that the purpose

23   was to find the competition for retaliation.

24   A    Retaliation.  Could be planned against rival

25   document groups.

JOSEPH – recross

1        MR. GILL:  No further questions; Your Honor.

2        THE COURT:  All right.

3        Thank you, Agent.  You may stand down.

4        THE WITNESS:  Thank you.

5                    (Witness stood aside)

6        MR. GILL:  With that we rest.  No further

7    witnesses.

8        THE COURT:  All right.

9        MR. SRISKANDARAJAH:  I would like to ask the

10   Agent one question as to retaliation.

11       THE COURT:  Go ahead.

12       MR. SRISKANDARAJAH:  Thank you, Your Honor.

13                    RECROSS EXAMINATION

14   BY MR. SRISKANDARAJAH:

15   Q    Agent, since that was opened up now --

16   A    Yes.

17   Q    -- in the past was it part of the

18   organization's technique to simply turn law

19   enforcement on to competitors?

20   A    You are asking if the practice was to turn, rat

21   out?  I don't know what instances there where that

22   occurred.

23   Q    So retaliation could mean simply get the cops

24   involved so they could be taken out; correct?

25   A    That would make no sense, since -- Cruz Millan,

1    as well as other members, as well, were summoned,

2    took place, to look at those numbers.  He says, also

3    said there enforcers that were present.

4    Q    Okay.

5         No further questions of this witness.

6         THE COURT:  Thank you, Agent.  You may stand

7    down.

8         THE WITNESS:  Thank you.

9         THE COURT:  The government has rested.

10        The defendant, do you have any evidence?

11        MR. SRISKANDARAJAH:  I do, Your Honor.

12        Court's indulgence, Your Honor.

13        THE COURT:  Let's take about ten minutes.

14                  (A recess was taken)

15        THE COURT:  All right.

16        Defendant?

17        MR. SRISKANDARAJAH:  Your Honor, I would like

18   to call Mr. Alfonso Alcaraz-Palomares.

19        THE COURT:  All right.

20                  ALFONSO ALCARAZ-PALOMARES.

21             WAS SWORN AND TESTIFIED AS FOLLOWS:

22                    DIRECT EXAMINATION

23                   (Through interpreter)

24   BY MR. SRISKANDARAJAH:

25   Q    Sir, please state your name for the record.

 1    A    Alphonso Alcaraz-Palomares.

 2    Q    How old are you?

 3    A    33.

 4    Q    Okay.

 5         Do you know Mr. Cruz Millan?

 6    A    Yes.

 7    Q    Okay.

 8         At some point you were transferred to Little

 9    Rock from Virginia Beach?

10    A    Yes.

11    Q    When -- who told to you go there?

12    A    Israel.

13    Q    Okay.  And did he tell you why you needed to go

14    go there?

15    A    Because there was nobody, nobody that was

16    there.

17    Q    Okay.

18         When he asked you to go there did he make any

19    reference to any kind of violence that had taken

20    place in Little Rock?

21    A    No.

22    Q    Now, what was your role in the, in the

23    organization?

24    A    I was one of the managers that did the job.

25    Q    Okay.

Alcaraz-Palomares – direct

1              Did Mr. Millan ever, paraphrasing, but did
2    Mr. Millan ever come to you and say something along
3    the facts, if any of -- I am planning an attack on
4    somebody in Little Rock and after it is over I am
5    going to need you to go to Little Rock?
6    A     No.
7    Q     Do you recall approximately when you first
8    found out you were going to go to Little Rock?
9    A     When he arrived, one or two days before I went
10   to Little Rock.
11   Q     Who arrived?
12   A     Israel.
13   Q     Okay.
14            At any point did you ever find out about any
15   kind of attack in Little Rock?
16   A     Yes, I did find out about it, an attack that
17   occurred there.
18   Q     And that was after the attack had occurred?
19   A     Yes.
20   Q     Who told you?
21   A     Well, through all the people, all the Hispanic
22   people that were all talking about it, and through
23   all of them I found out.
24   Q     Did any of them ever mention that Mr. Millan
25   had anything to do with the attack in Little Rock?

1   A     No.

2   Q     In the community would people know who in the

3   organization that were part, a part of -- would

4   people know if an attack had been ordered?

5   A     Well, that I know; no, no.

6   Q     After talking -- after the people in the

7   organization were talking about the attack in Little

8   Rock, there was absolutely no mention of Mr. Millan

9   having anything to to do with the attack?

10   A     No, no, they didn't say anything about that.

11   Q     Okay.

12         No further questions for this witness, Your

13   Honor.

14         THE COURT:  Any questions from the government?

15         MR. COMBS:  Yes, Your Honor.

16                     CROSS EXAMINATION

17   BY MR. THOMPSON:

18   Q     Good morning, sir.

19   A     Good morning.

20   Q     You first joined the organization in 2004,

21   right?

22   A     Yes.

23   Q     And then you came in as a cell manager in

24   Little Rock, Arkansas in February of 2009; right?

25   A     Yes.  True.

Alcaraz–Palamores – cross

1    Q    And who appointed you cell manager in 2009?

2    A    Israel.

3    Q    By Israel, who do you mean?  Please point out

4    who you are talking about.

5         May the record reflected he pointed to the

6    defendant?

7         THE COURT:  The record so reflects.

8    BY MR. THOMPSON:

9    Q    At some point did you go to Virginia Beach in

10   August of 2009?

11   A    Um hum.  Yes.

12   Q    Who told you to go to Virginia Beach?

13   A    Israel.

14   Q    Did you stay in Virginia Beach until the

15   defendant, Israel Cruz Millan, told you to go back

16   to Little Rock?

17   A    Yes.

18   Q    That was in the end of July of 2010?

19   A    Yes.

20   Q    He told you in person, right?  He came to

21   Virginia Beach?

22   A    Yes.

23   Q    And when he met you he also told you there was

24   a problem in Little Rock; right?

25   A    He just told me that I had to go there because

1    they were very low on people there.

2    Q    And you recall meeting with investigators on

3    May 13th of 2011; is that right?

4    A    Um hum.

5    Q    And you were meeting with us pursuant to a

6    cooperation agreement?

7    A    Yes.

8    Q    And do you recall at that meeting telling

9    investigators that Israel told you there had been a

10   problem in Little Rock, and that was why you were

11   going back?

12   A    Gosh, I didn't remember but --

13   Q    But -- and then you at some point also spoke

14   with Arasmo, Edy Oliverez; right?

15   A    Yes.

16   Q    He told you about someone who had been killed

17   in Little Rock, right?

18   A    Yes.

19   Q    And you talked to Israel and tried to talk to

20   him about that incident, didn't you?

21   A    Um hum.

22   Q    But he refused to talk to you and kept changing

23   the subject; is that right?

24   A    Yes.

25   Q    So he didn't want to talk about something?

1          MR. SRISKANDARAJAH:  Objection.

2          THE COURT:  He can't tell you what was in

3     somebody else's mind.

4     BY MR. COMBS:

5     Q    Now, let's talk about the competition.

6          One of the rules of the organization was that

7     you were to get the phone numbers of the

8     competition; right?

9          MR. SRISKANDARAJAH:  Judge, this goes beyond

10    the scope of my direct.

11         THE COURT:  No.

12         THE WITNESS:  Could you repeat the question,

13    please?

14    BY MR. THOMPSON:

15    Q    You were responsible as a cell manager for

16    getting phone numbers from the competition.

17    A    Yes.

18    Q    Who did you give the phone numbers to once you

19    got them?

20    A    Israel.

21    Q    You told investigators on May 11 of 2011 that

22    you gave them the numbers so that he could either

23    fight or talk with the competitors, right?

24         THE INTERPRETER:  The interpreter requests a

25    repetition.  To fight?

1    BY MR. THOMPSON:

2    Q    Fight or talk with the competitors.

3    A    I would just give it to him, and then I don't

4    know what would happen there.

5    Q    But you told investigators --

6         MR. SRISKANDARAJAH:  Objection.  Asked and

7    answered.

8         THE COURT:  No.  You can go ahead and try to

9    clarify it.

10   BY MR. THOMPSON:

11   Q    So, but you told investigators that you thought

12   the reason was to fight or talk?

13        MR. SRISKANDARAJAH:  Objection.

14        THE COURT:  The objection is sustained.  You

15   are asking him to speculate now.

16   BY MR. THOMPSON:

17   Q    Now, when you -- who did you talk to to get

18   resource materials for printing documents?

19   A    Israel.

20        MR. SRISKANDARAJAH:  Clearly goes beyond the

21   scope of my direct.

22        THE COURT:  The witness is here.  You brought

23   him here.  He can ask him questions.  .

24        MR. THOMPSON:  I will be very brief.

25        Also, you sent money back always at the

```
 1    direction of Israel Cruz Millan; correct?

 2         THE WITNESS:  Yes.

 3    BY MR. THOMPSON:

 4    Q    But he told you what to do on a day-to-day

 5    basis.

 6         No further questions.

 7         THE COURT:  All right.

 8         Anything further?

 9         MR. SRISKANDARAJAH:  Yes, Judge.

10                    REDIRECT EXAMINATION

11    BY MR. SRISKANDARAJAH:

12    Q    Senior -- sorry.

13         Sir, you said that you talked to Edy about the

14    violence that occurred in Little Rock?

15    A    Um hum.

16    Q    Did Edy say that Mr. Millan, Cruz Millan, had

17    anything to do with the violence in Little Rock?

18    A    No.  Not to me.  No, he didn't.

19    Q    Did he ever say anything to the effect of Cruz

20    Millan didn't know anything about it?

21    A    No, he didn't say anything like that.

22    Q    Okay.

23         Did Mr. Millan ever -- you were one of the cell

24    managers; correct?

25    A    Yes.
```

Zuniga-Galvan – direct

1    Q    To the best of your knowledge when you were a

2    cell manager did Mr. Cruz Millan ever order violence

3    against any of your competitors?

4    A    No.

5    Q    Nothing further.

6         THE COURT:  Thank you, sir.

7         You may stand down.

8                   (Witness stood aside)

9         MR. SRISKANDARAJAH:  I ask for Luis

10   Zuniga-Galvan.

11        THE COURT:  All right.

12        Luis Zuniga-Galvan.

13                   LUIS ZUNIGA-GALVAN

14            WAS SWORN AND TESTIFIED AS FOLLOWS:

15                   DIRECT EXAMINATION

16   BY MR. SRISKANDARAJAH:

17   Q    Sir, please state your full name for The Court.

18   A    Luis Zuniga-Galvan.

19   Q    Do you know Mr. Cruz Millan?

20   A    I met him the day that I was charged.

21   Q    Okay.

22        You have talked to Mr. Millan in the past,

23   prior to that; correct?

24   A    On the phone?

25   Q    Yes.

Zuniga-Galvan – direct

1    A    Yes.

2    Q    And do you remember a time on or about

3    November 2010 talking to him about the competition?

4    A    Yes.

5    Q    Do you recall a time when during that

6    conversation Mr. Muerto, Mr. Cruz Millan, said,

7    let's do something evil to them, don't you think, or

8    something like that?

9    A    No, I don't remember that.

10   Q    Okay.

11        In the organization that you were a part of

12   when the word "Tios" is used; what does it mean?

13   A    Tios?

14   Q    Tios.  T-I-O-S.

15   A    Policeman.

16   Q    Okay.  Do you remember having a problem with

17   the competition in your area?

18   A    Yes.

19   Q    Do you remember Mr. Millan asking you to find

20   out who the competition was?

21   A    Yes.

22   Q    Do you recall Mr. Millan ever telling you, find

23   out who they are, and we will turn them over to the

24   police?

25   A    Yes.

1    Q    In the past had Mr. Millan ever told you to

2    turn people over to the police?  Competition?

3    A    Just that one time.

4         From then on he didn't talk again about

5    competition or policemen.

6    Q    Okay.

7         I have no further questions for this witness,

8    Your Honor.

9         THE COURT:  Anything from the government?

10        MR. GILL:  Yes, Your Honor.

11                    CROSS EXAMINATION

12   BY MR. GILL:

13   Q    Mr. Galvan, my name is Mike Gill, U.S.

14   Attorney's office.

15        We have never spoken before, have we?

16   A    No.

17   Q    Now, sir, with respect to your involvement in

18   the organization.  Who was it that was in charge of

19   directing acts and dealing with competition?

20   A    Like what was happening?  Like what I had to

21   give?

22   Q    Yes.

23   A    Well, to Mr. Cruz Millan.

24   Q    In fact, isn't it true, sir, that with respect

25   to acts involving competition that Israel Cruz

1    Millan was in charge of the decision that you are

2    aware of?

3    A    Well, I imagine so, because everything -- we

4    had to tell him everything.

5    Q    So he was aware of what you were doing in

6    Boston, Massachusetts?

7    A    Well, the time I would call him I would tell

8    him what was going on.

9    Q    And you would never do anything to the

10   competition without him knowing about it, would you?

11   A    Yes.

12   Q    In fact, sir, when you were talking about your

13   acts and passing information about the competition

14   up to Israel Cruz Millan around the October 2010

15   time frame, do I have that right?

16   A    Um hum.

17   Q    That is a "yes?"

18   A    Yes.

19   Q    In fact, the problem was, does it sound

20   familiar that the competition was selling documents

21   for a hundred dollars a set, $60 below what you were

22   supposed to be selling them for?

23   A    Um um.  Yes.

24   Q    And there were various people up there who were

25   helping you out with that situation, weren't there?

1    A    Yes, there were two people.

2    Q    In fact, was there an individual referred to as

3    Pedrino?

4    A    Pedrino?

5    Q    How about an individual known as Pelone or

6    Doberman?

7    A    That I remember, no.

8    Q    Are you aware after you reported this

9    information to Israel Cruz Millan that agents

10   intercepted another call between him and another

11   unknown male who was helping you up there in Boston?

12   A    I don't know who -- if you could explain to me

13   a bit better.

14   Q    Absolutely.

15        Would it surprise you to learn that during the

16   conversation that occurred the same day that you

17   reported this information to Israel Cruz Millan that

18   he is talking to somebody about, "Well, just find

19   out, and I quote, who they are.  We might as well,

20   when I go up there we can beat the shit out of them.

21   Fuck it, we might as well."

22        MR. SRISKANDARAJAH:  Judge, I am sorry --

23        THE COURT:  Sustained.

24   BY MR. GILL:

25   Q    Were you involved in following the competition

1    on October 12, 2010?

2    A    No.

3    Q    Are you aware that other individuals were

4    actually in a vehicle following the competition as

5    they were driving a 2004 red Windstar?

6    A    No, I didn't know about that then.  I found out

7    about that later.

8    Q    What did you find out about it later?

9    A    About that.  What you are saying about they

10   were following them.  That I found out about that

11   after I was arrested.

12        And my attorney, my attorney was the one who

13   told me about that.

14        THE COURT:  All right.  Let's move.

15        You keep asking, is he aware of stuff, and he

16   he got information from his lawyer, and then another

17   lawyer, and he doesn't know a darn thing about it.

18   Come on.

19   BY MR. GILL:

20   Q    You testified on direct you weren't aware of

21   any other instances in Boston where you were trying

22   to find competition for the defendant.

23        I am sorry.  You testified on direct that you

24   were not involved in any other instances aside from

25   this one in trying to find competition for the

1    defendant.

2    A    Exactly, yes.

3         MR. GILL:  Your Honor, I am going to mark this

4    as Government's exhibit 29.

5         It is a November 14, 2010 wire intercept

6    transcript involving the defendant and Luis

7    Zuniga-Galvan in which they were discussing the

8    competition.

9         I don't have the recording here in court.  Can

10   I read the portion that is attributed to him?

11        THE COURT:  Go ahead.

12        THE INTERPRETER:  The interpreter would request

13   a copy.

14        MR. GILL:  This is the only copy I have.

15        May I approach?

16        THE COURT:  Sure.

17        MR. GILL:  Thank you.

18   BY MR. GILL:

19   Q    Sir, in this recording between you and

20   defendant Muerto it has that you -- your nickname

21   was Ronna; correct?

22   A    Well, there they put me down as Ronna, but I am

23   Ramuna.

24   Q    Okay.

25        During this conversation you say, "Okay, so

```
1    then I am going to drive around and check out the

2    competition.  Right?"

3         Muerto responds, "All right."

4         You say, "And when I have, when it's true, when

5    it is a hundred percent, then, true, then I will

6    call you.  All right."

7         And Muerto responds, "That is fine."

8         Isn't that a fact, sir, that you are discussing

9    following the competition for him?

10   A    Yes.

11        But that was just to get rid of him.  Nothing

12   was done with that.  I just kept saying, yes, yes, I

13   could so he wouldn't keep bugging me.  And that is

14   why I would say that.

15   Q    May I have one moment, Your Honor?

16        No further questions, Your Honor.

17        THE COURT:  All right.  Anything else?

18        MR. SRISKANDARAJAH:  One moment.

19        One very brief question, Judge.

20                   REDIRECT EXAMINATION

21   BY MR. SRISKANDARAJAH:

22   Q    Sir, I may have already asked this question.  I

23   apologize to The Court in advance if I have.

24        Do you know whether Mr. Millan ultimately

25   reported the competitors to the police?
```

1    A    I don't know.  The thing was that one time that

2    he told me to get the information about the

3    competition so that he was going to call the police

4    on them.  And then he was going to call the police.

5    And then that is all that I know about that.

6    Q    Nothing further, Your Honor.

7         THE COURT:  You may stand down, sir.

8         Anything else from the defendant?

9         MR. SRISKANDARAJAH:  No, Your Honor.

10        Thank you, Your Honor.

11        THE COURT:  All right.

12        I will hear brief argument on the motion.

13        MR. GILL:  Your Honor, the guideline range

14   before The Court is 235 to 293 months and doesn't

15   account for many, many, key things that are

16   connected to this defendant's conduct on behalf of

17   the enterprise.

18        That guideline range, number one, doesn't take

19   into account the shear violence and terror that he

20   spread on that October 29, 2010 call.  It takes into

21   account the kidnapping, but it does not account for

22   the level of violence that he used against El

23   Chingway, the victim of that attack.  Doesn't

24   account for the fact that he extended that torture,

25   and was tortured over two separate phone calls, at

1    length, subjecting that victim to severe beatings on

2    the call for brothers in the organization to hear.

3         It doesn't take into account the other acts

4    that Agent Joseph testified about.

5         I will talk in a minute briefly, but there is a

6    whole laundry list of things that aren't even

7    factored into it, including the organization under

8    his control, connections to the murder in Little

9    Rock, Arkansas, all of these violent acts that he

10   directed as shown by the wire intercepts in

11   Nashville, Tennessee, Covington, Kentucky and

12   Boston, Massachusetts.  And there is many many

13   others that we definitely don't know about because

14   frankly, Your Honor, illegal aliens don't report

15   these attacks.  The only way law enforcement comes

16   across these is if we have them on radar.

17        The guidelines don't account for the money

18   laundering activities where they are sending over,

19   easily over $360,000 a year back to Mexico in

20   illegal proceeds.  It doesn't take into account that

21   they are pushing, and I believe it is conservative

22   and fair, well within what is before this court to

23   say moving about 20 documents a year.

24        Other defendants who appeared before this court

25   received significant departures based on all that

1    conduct.

2        Now, when we look at the nature and

3    circumstances of this offense and everything that he

4    did.  I believe his name hits him well.  Muerto, the

5    dead one.  He is all about terror.  The enterprise

6    that has been before this court for over a year now

7    does not work without a Muerto at the helm.

8    Enterprise such as this does not work without terror

9    being struck in the heart of those who work for him,

10   as well as the competition that falls in their path

11   of the organization.  The pattern of violence is

12   staggering.  And it shows that he has no remorse

13   whatsoever.

14       They have he had no intention of changing his

15   behavior in light of what happened in Little Rock,

16   Arkansas.  Now, he was not on the ground in Little

17   Rock.  But, Your Honor, I believe that it is fair

18   based on the evidence before this court, knowing how

19   the organization works, including testimony of two

20   witnesses who testified on behalf of the defense,

21   nothing happened in this enterprise without Israel

22   Cruz Millan being involved in the decision.

23       Everybody is instructed across the board to

24   identify the competition, to report it up the chain,

25   and then he sets the retaliation and he gives the

1    orders for the attack, the attack such as the one

2    that occurred in Chesterfield, Virginia back in June

3    of 2009.  And then the attack occurred July 16,

4    2010.  And with respect to July 6 of 2010, we

5    believe that the background knowledge about the

6    pattern of organization plus the evidence before

7    this court shows unquestionably he was involved as a

8    supervisor, unquestionably he was aware of what

9    happened.  Toll records don't lie.  And we have tied

10   them to that number 240-1780 that is referenced in

11   exhibit ten that Agent Joseph testified to.

12        That number is calling his mother during the

13   same time period it was his phone.  What are the

14   odds, Your Honor?  It is beyond reason, frankly,

15   that Edy Oliver Jiminez, the man convicted at trial

16   for that murder, is talking to Israel Cruz Millan

17   the night before that occurs, on July 5 of 2010.

18   And they have 17 minutes total of conversation.  In

19   fact, I believe 19 minutes.  That is on Government's

20   exhibit 12.  They have a long conversation.  If you

21   look at the same toll records the very next call

22   between them is when the defendant is calling Edy

23   Oliverez-Jiminez at the time the murder falling.  I

24   believe it is reasonable they had established that

25   he was going to contact them at the time that the

1    attack was occurring to check on the status and to

2    get an update.  And when you look at that pattern in

3    connection with Government's exhibits, I believe it

4    is 13, that is the toll -- the brief summary about

5    what was going on with the three phones that we know

6    were at the murder location, those phones, every one

7    of them, were turned off at the time he is being

8    murdered.  Several calls go in, none are received,

9    except for one call, one call that at 1:18.  And,

10   Your Honor, looking at that, that means that Edy

11   Oliverez-Jiminez had to turn his phone on to accept

12   that call that came in from the defendant, because

13   Edy Oliverez-Jiminez knew his boss was going to be

14   contacting him to check on what is going on in

15   Little Rock, Arkansas.

16        He knew exactly what was going on.  He ordered

17   the competition -- the attacks like they have done

18   in every other instance -- and the other calls that

19   we have just show his involvement in that.  He was

20   involved.  He knew what was happening.  I am sure he

21   did not order the murder of Pascal, but he ordered

22   the attack of the competition and the events led to

23   the unfortunate death of that 17 year old.

24        The phone calls afterwards tell the tale that

25   he was heavily involved.  Government's exhibits 14,

1    the call between Edy Oliverez-Jiminez and -- or

2    actually 15, I apologize, Edy Oliverez-Jiinez and

3    Armando Gonzalez Medina.  They are talking about in

4    that call Cruz Millan told them, if you don't like

5    what is going on, you can get out.  And he says,

6    that he, he being the defendant, sent them to hell.

7    He ordered them to take part in that attack, and

8    they did.  And that 17 year old died as a result.

9    And then the final call that we introduced between

10   Edy Oliverez-Jiminez, the convicted murderer, and

11   the defendant shows he was fully aware of what was

12   going one.  He knew that one victim had been left

13   alive, and he can't send Edy back to that location

14   or he would be identified.

15        Anybody with half a conscious would have

16   stopped.  Anybody with half a conscience would have

17   changed behavior after that, after that young boy

18   died.  But he did not.  Instead he steps up his

19   activities and that is when the investigation kicks

20   in and all of those wire intercepts and pattern we

21   talked about show how deadly this defendant is

22   before this court.  Nashville, Tennessee.  He shows

23   no hesitation whatsoever in that call that we played

24   for The Court when he is talking to Feo.  They are

25   talking about steps, and the defendant is screwing

1     with him.  They have got abandoned house.  Check.

2     Do you have the phone?  Check.  Be sure wipe down

3     for fingerprints.  You don't want to leave any

4     evidence.  It is like a "how to" book directed by

5     the defendant for all cell managers across the

6     country on how to do these attacks when they are

7     going to lure a competitor in.

8          Covington, Kentucky shown by Government's

9     exhibits 26, is the same deadly pattern.  And also

10    shows how they like to use women to lure

11    competition, because they are less suspecting.

12    Again, that mirrors what happened in Little Rock,

13    Arkansas when they tried to use S. O., who testified

14    at trial, to lure in the victim.

15         The discussions between Ramirez on the calls we

16    put before this Court show the level of violence he

17    is directing, that he wants these cells to engage

18    in, including having them have screwdrivers and have

19    baseball bats, and that they got to be ready in

20    dealing with the competition.

21         With respect to Boston, same thing was going

22    on.  He is talking about, those calls are clear, and

23    I know The Court has read them.  Talking about

24    beating up the competition, and the only thing that

25    changes in the call is because they realized the

1     competition was driving around with five or six

2     members because they knew they would be attacked,

3     and he decided, okay, we are not going to do an

4     attack, I will turn them over to the police.  He

5     made a strategic decision not to do that.  But he is

6     directing these, if they are going in two or three,

7     you can bet it would have been another attack.  He

8     is engaged in the same pattern all along.

9         But when you add to that external violence, the

10    internal violence and the way that he directed the

11    organization it is frightening.

12        That guideline range presently before this

13    court only accounts for the kidnapping.  I mentioned

14    earlier it doesn't account for the, pardon the

15    language, but the hell that he put that victim

16    through on these two conference calls just so he

17    could prove a point to the enterprise.  Just so he

18    could scare everyone, this is what I am going to do

19    if you steal from the organization.  And he himself

20    uses the word "torture" many times in those calls.

21    And the only reason that that event stopped is

22    because the police department got on their doorstep

23    during the investigation, and certainly not because

24    of anything this defendant did.  And frankly the

25    victim is lucky he wasn't killed with a metal bat or

1     being electrocuted with jumper cables and everything

2     else he went through.

3          All that aside, the non violent aspect of this

4     case also warrants departure.  I mentioned a number

5     of documents.  You are aware of that.  Mentioned the

6     money laundering.  These factors that this Court has

7     relied upon in departing upward in all the other

8     defendants for which their scope of involvement is

9     so much lower than his.  Sometimes four or five

10    levels the defendants have received for acts of

11    violence or for the level of documents.

12         I want to end with what I believe to be the

13    most important, what United States firmly believes,

14    the most important 3553 factors that apply to the

15    sentencing before this court.  That is, not only the

16    seriousness of the offense which I have described

17    for The Court, but the need for deterrence.  This is

18    a unique opportunity for this Court -- and this is

19    an opportunity that doesn't come very often to

20    Virginia, or frankly, any other court in the United

21    States -- because present before you today, Your

22    Honor, is in effect a cartel leader.  He is at the

23    highest level of the organization.  He was in charge

24    of the United States operations for this

25    organization.  And with the level of violence that

1    the evidence has shown this Court that he is

2    responsible for, and the level of violence this

3    country is dealing with on its borders, of respect

4    to the drug cartels and other gangs out of Mexico

5    that are bleeding into the United States, and law

6    enforcement has spent day in and day out trying to

7    fight it, trying to stop it.  That it seems

8    sometimes that there is no end to it.

9         But we are certain that a strong sentence of

10   this Court sends the right message.  We believe 50

11   years is right.  We believe the facts warrant it.

12   We believe that it needs to be sentenced, and that

13   the cartel leaders, the leaders of this violence in

14   Mexico, they get the messages that Cruz, Cruz Millan

15   was sentenced to 50 years and this is what is going

16   to happen if you come into this country over the

17   period of two years and engage in this level of

18   violence, this level of destruction.  The lives he

19   destroyed, not only that family in Little Rock, but

20   the list of those who work for him and the untold

21   victims that we will never know because they are

22   illegal aliens, all at his hands.  Nothing happened

23   to this group without his knowledge.

24        For all those reasons we respectfully request

25   this Court to upward vary and to give him that 50

1    year sentence.  We believe it is just and warranted

2    by the facts.

3         Thank you, Your Honor.

4         THE COURT:  Thank you.

5         Defendant?

6         MR. SRISKANDARAJAH:  Judge, I will pick up

7    where Mr. Gill leaves off.  What I will tell this

8    Court is Mr. Gill is right.  Mr. Cruz Millan from

9    what the evidence shows was the person who was in

10   charge of running the operations for the United

11   States.  What Mr. Gill says to The Court is Mr. Cruz

12   Millan is 26 years old.  The message that Mr. Gill

13   is asking this Court to send out today is that there

14   is never any redemption for a human being short of

15   spending his entire life in a jail cell.  Mr. Gill

16   wants this Court to lift up the federal penitentiary

17   as high as it could lift it up, throw Mr. Millan

18   under that cell, and slam it back down on him.

19   Because, in essence, that is what a 50 year sentence

20   is going to do.

21        What I will tell The Court is this, and that is

22   the premise that I would ask this Court to consider

23   is Mr. Millan.  Judge, we all do things that at some

24   point in our lives that result in, taking a phrase,

25   our life is like a field.  You sew seeds.  If you

1    sow good seeds, we are taught and led to believe, a

2    good yield will come.  If you sow bad seeds, you

3    will reap the same.  Mr. Millan without a doubt in a

4    very short period of time has sowed some very, very

5    bad seeds.  It is chilling to hear, and no one can

6    deny, that that audio tape about the incident that

7    occurred, Mr. Millan must be punished for that.

8    There is no doubt about it.

9        The question that comes before this court is

10   what is the appropriate amount of punishment.  And

11   the only person who can decide that is you.

12       I could stand here before this Court and ask

13   this Court and throw numbers at The Court, but,

14   Judge, I am not going do that because the reality

15   is -- and this is not an endeavor to fight with this

16   Court -- this Court has far greater wisdom in terms

17   of watching a lot of cases that come before it than

18   anything I can tell The Court about what is an

19   appropriate sentence.  This is ultimately The

20   Court's decision.

21       What I will tell The Court is this incident in

22   Arkansas that the government keeps pounding its fist

23   on the table and saying it is all Millan, I would

24   submit to The Court is not an accurate statement.

25   There is absolutely no contest that shows that

1    Mr. Millan has anything to do with ordering any kind

2    of violence in Arkansas.  There is no question that

3    he engaged in violence internally.  But the Arkansas

4    incident, Your Honor, is there is nothing to back it

5    up.  We could engage in a significant amount of

6    speculation and conjecture, but if The Court were to

7    look at the cold hard facts there is nothing that

8    shows that Mr. Millan had anything to do with

9    ordering it.

10        The transcript does show that Mr. Millan knew

11   about this incident.  But I will tell The Court that

12   the transcript shows subsequent to the fact, not

13   prior to the fact.  That is the distinction, Judge.

14   Yes, he has been described as a micromanager.  But

15   this Court knows very well that there are roving

16   employees who go out and do things on their own.

17        And to hold Mr. Millan liable for something an

18   employee of his did, without any evidence thereof

19   that Mr. Millan had anything to do with it, would be

20   unfair to him.

21        Now, this Court has ample other reasons to

22   sentence Mr. Millan.  This is not some pure angel

23   who comes before this court and says, gee, Judge, I

24   made a few mistakes and that is all I did.  The

25   evidence is clear about that.

1      But not -- but I would ask this Court not to

2    hang its hat on the Arkansas incident.

3      You heard directly from two members of this

4    organization that he did not order any acts of

5    violence.  The two people we put before this court

6    testified to that.

7      J. N. N's trial testimony states Cruz Millan

8    was not aware of the Little Rock Arkansas incident.

9    No one debates.  That is about as clear as it can

10   be.

11      There is definitely some conflict in testimony

12   from D. S. A. about what happened in Arkansas.  But

13   the bottom line is, you can hear his voice.  He was

14   there.  And he concedes to it.  What is most

15   compelling about Mr. Millan is that when asked

16   about, when he is being questioned by the agents,

17   their own agent testified that the standard pattern

18   is they deny it then they come forward and 'fes up

19   to what they were involved in.  That is exactly what

20   happened.  Mr. Millan denied the Raleigh incident.

21   Then admitted to the incident with Raleigh.  But

22   when asked about the Arkansas, he held his ground.

23      The agent tried to play it off as well, he

24   didn't really say anything.  But the reality is he

25   held firm.  The government takes the position in its

```
 1    sentencing memorandum he should be given 50 years

 2    but he shouldn't be given the one-point reduction

 3    for acceptance of responsibility.  In our memorandum

 4    we clearly show The Court Mr. Millan has always said

 5    throughout this entire case, I accept responsibility

 6    for the following things.  But he was never given an

 7    opportunity to plead until literally the day before.

 8    If he had given that opportunity he would have come

 9    before this Court two years ago and said to The

10    Court, I am guilty.  I did it.  I don't deny it.

11    But that is not what he was given an opportunity to

12    do.

13         The government steadfastly said it is an all or

14    nothing deal.  Take the murder or you don't get a

15    deal.

16         You don't even get to plead to these counts.

17         That is the position the government took.

18         That is not the action of a man who comes

19    before this court and says, I am guilty of these

20    things.

21         Judge, we have briefed this in great detail for

22    The Court.  I would submit to The Court there is a

23    case that shows Mr. Millan does a lot of chest

24    thumping, we are going to get these guys, we are

25    going to do these guys.  But the reality is he
```

```
 1      doesn't do anything.  We, when he is dealing with
 2      the competitor, he calls the titos, the police.  So
 3      he says, well, we will get the police involved.
 4      That is how he fixes his problem.
 5           Your Honor, I would ask this Court, I would
 6      also tell The Court, Judge, the Raleigh incident is
 7      already taken into account in the guidelines.  That
 8      has already been addressed.  To say that there is
 9      further enhancement that should occur, I would
10      submit is, again, coming back to the analogy or
11      example I give The Court, which is hold up the
12      federal penitentiary as high as you can and throw
13      him underneath it.
14           To take everything in context, Judge, and to
15      say that Mr. Millan is a monster with no chance of
16      redemption is an unfair position to take for the
17      government.  To take the position he is a cartel
18      member who should be made an example of, Judge, I
19      ask to you think about a 26-year-old man here before
20      this Court.  The Court has to decide, is there a
21      potential for redemption for Mr. Millan.
22           Thank you, Your Honor.
23           THE COURT:  All right.
24           MR. SRISKANDARAJAH:  One last thing.  I also
25      stated in my memorandum, in subsequent memorandum as
```

1    to the facility, I believe it is in Kentucky for

2    placement, if The Court would do that as well.

3         Thank you, Your Honor.

4         THE COURT:  All right.

5         Let me resolve the motion first of all.

6         Let me be clear, the first thing is the motion

7    before The Court relating to the variance is a very

8    particular and specific motion that The Court will

9    deal with within the discretionary guideline regime.

10   The question that comes to a variance from a

11   particular guideline range relates to very specific

12   considerations that have not been taken into account

13   by the probation department in putting together

14   their presentence report, and the work sheets that

15   are attached thereto.  So, obviously, a variance is

16   a very different thing than departure.

17        So dealing with the motion for a variance, that

18   motion will be denied.  And the reason for that is

19   that all of these things that the government has

20   appended or pinned its arguments on are considered

21   by the probation department in coming up with the

22   this guideline range.

23        For instance, a lot of the discussion about the

24   incident involving the kidnapping and abduction,

25   unlawful restraint of an individual who was a part

1    of the conspiracy.  Well, that is what has driven

2    this guideline range to the point where it is.  32

3    points based on that.

4        And then it's not over.  They give another two

5    points for the serious bodily injury being

6    sustained.  And then another two points for

7    dangerous weapon being used.  Jumper cables and a

8    battery.  And then he gets four points for role in

9    the offense.  And that gets you up to 40 minus two

10    for the cooperation.

11        It is clearly not only has it been taken into

12    consideration, it has run this truck a thousand

13    miles down the road from where it would be if it

14    wasn't there.

15        So, to suggest that that activity is not taken

16    into consideration is just not true.

17        And it is the same thing with the number of

18    documents.  You have plus nine as relates to the

19    number of documents, plus 14, more than $400,000

20    loss.  All of these things were considered.  So the

21    request for a variance is not appropriate and will

22    be denied.

23        Now, on the issue of departure, there are a few

24    things that The Court can look at to make some

25    determination about whether or not a sentence

1    outside of the guideline range is appropriate.  And

2    I will do that at the appropriate time.

3        Mr. Cruz Millan, would you stand where you are,

4    please.

5        Sir, do you have anything you would like to say

6    before The Court imposes sentence?

7        THE DEFENDANT:  Yes, Your Honor.

8        THE COURT:  Go ahead.

9        THE DEFENDANT:  I don't want to seem like if I

10   am feigning something.  I want to say it as I really

11   feel it.

12       I believe that the incident that took place in

13   Raleigh was horrible.  It was part of a decision I

14   was forced to do, and because of that I did that.

15       I do not deny my participation, and I have

16   admitted from the beginning that I did do it.  And I

17   believe I deserve to be in jail for that same

18   reason.

19       I do not deny either that I was involved with

20   the documents and the money.

21       For that reason, Your Honor, I want to

22   apologize to you, Your Honor, in your own behalf and

23   on behalf of your country.

24       I am fully sorry.  I think perhaps it is too

25   late to say I am sorry, but I don't know if there is

1    is something else I could say at this moment.

2    Perhaps the only thing I can add is if you could

3    give me an opportunity to try my redemption, because

4    of my family, because of my five year old child,

5    with whom I have never been able to be and to give

6    him an education.

7        Perhaps to fulfill some of the wishes that my

8    family at one time had for me, perhaps my mother.

9        Perhaps if I had the opportunity to go back to

10   school to become somebody in life to develop a

11   professional career.  To be a good father, to be a

12   good husband to my wife, who has had a lot of

13   problems with mental health.  And in that way to

14   change.

15       The hope that I have for something positive,

16   for something that, where I can fix things in the

17   future.

18       Finally what I would like to say is I am truly

19   sorry, and I apologize.  But if you give me one last

20   opportunity, believe me I will not fail you.

21       That is all, Your Honor.

22       THE COURT:  All right.

23       It is the judgment of The Court that the

24   defendant, Israel Cruz Millan, is hereby committed

25   to the custody of U.S. Bureau of Prisons to be

1   imprisoned for a term of 300 months.  The term

2   consists of 240 months on count one, 240 months on

3   count ten, all to be served concurrently.  A term of

4   60 months on count nine to be consecutive to the

5   other sentences imposed on counts one and ten.  The

6   defendant is remanded to the custody of the U.S.

7   Marshal.  He will receive credit for any time that

8   he has previously served related to this offense.

9   Obviously, this is an upward departure, and the

10  basis for that is as clearly the leader of this

11  organization Mr. Cruz Millan has to take more

12  responsibility than the others.  His involvement in

13  violence is clear.  The other individuals, the

14  number of documents and the money involved drove to

15  some extent the departure in their cases and would

16  be no different here.

17       The fact of the matter is, the exacerbating

18  circumstances were more taken into account in this

19  case than the others.

20       The defendant is remanded to the custody of the

21  Marshal.  Upon release from imprisonment the

22  defendant shall be placed on supervised release for

23  a term of three years.  This term consists of three

24  years on count one, term of three years on count

25  nine, and a term of three years on count ten, all to

 1    run concurrently.

 2         Within 72 hours of release from the custody of

 3    the Bureau of Prisons the defendant shall report in

 4    person to the probation office in the district to

 5    which he is released.  While on supervision the

 6    defendant shall not commit another federal, state,

 7    or local crime, and he shall not unlawfully possess

 8    a controlled substance.  He shall not possess a

 9    firearm or other destructive device.  The defendant

10    shall comply with the standard conditions as

11    recommended by U.S. Sentencing Commission.  The

12    defendant shall also comply with the following

13    special conditions:  As a condition of supervised

14    release upon completion of the defendant's term of

15    imprisonment the defendant is to be surrendered to a

16    duly authorized immigration official for deportation

17    in accordance with established procedures.

18         As a further condition of supervised release,

19    if ordered deported the defendant shall remain

20    outside of United States.  The Court has considered

21    the defendant's financial situation in its totality,

22    and The Court finds that the defendant is not

23    capable of paying a fine, and therefore none will be

24    imposed.  As to count one the defendant shall pay a

25    special assessment of a hundred dollars; likewise,

1    as to counts nine and ten, for a total special

2    assessment due of $300.  The special assessment

3    shall be due immediately.  Any balance remaining

4    unpaid on the special assessment at the beginning of

5    supervision shall be paid by the defendant in

6    installments of not less than $25 per month until

7    paid in full.  Said payment shall commence 60 days

8    after the defendant's supervision begins.  Payment

9    of any unpaid balance shall become special condition

10   of supervised release.

11        Any forfeiture previously entered is hereby

12   made a part of the sentence and shall be included in

13   the judgment.

14        The Court will make no recommendation to the

15   Bureau of Prisons regarding precise place for

16   housing of Mr. Cruz Millan.  The closest appropriate

17   facility to his home is the most that I will say.

18        Mr. Cruz Millan, you have a right to appeal any

19   sentence imposed by this court.  If you are going to

20   do that, you would have to file a notice of appeal

21   within 14 days of today's date.

22        The government, you still have all of those

23   superseding indictments?

24        MR. GILL:  We do, Your Honor.  And we move to

25   dismiss the remaining indictments and other counts

1    pending with respect to this defendant.

2        THE COURT:  All right.  That motion will be

3    granted.  Remaining indictments and counts other

4    than those to which he pled will be dismissed.  All

5    right.

6        That completes the matter.

7        Thank you all very much.

8                    HEARING ADJOURNED.

9

10        THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

11

12                GILBERT FRANK HALASZ, RMR

13                 OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              INDEX

3

4

5        WITNESS                        pAGE

6    JOSEPH                              6
     PALOMARES                          77
7    GALVAN                             86

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25